FILED-CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS    04 MAR -2  AM 10: 29

TEXAS-EASTERN

MARSHAL DIVISION

BY_____

| | | |
|---|---|---|
| **TROY CLARK,** | § | |
| Petitioner | § | |
| vs. | § | CIVIL ACTION NO. 2:03cv357 |
| **DOUG DRETKE**, Director | § | |
| Texas Department of | | |
| Criminal Justice, Correctional | § | |
| Institutions Division | | |
| Respondent | § | |

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON SENTENCED TO DEATH CURRENTLY IN STATE CUSTODY

TO THE HONORABLE JUDGE T. JOHN WARD, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION:

TROY CLARK, Applicant, by and through his appointed attorney of record, Craig L. Henry, files this Petition for Writ of Habeas Corpus and in support shows the following:

### I.    JURISDICTION

Petitioner invokes the jurisdiction of this Court pursuant to 28 U.S.C. Section 2254.

### II.    CUSTODY

1.    Petitioner is a citizen of the United States and a resident of the State of Texas. He is presently confined in Respondent's custody on Death Row in the

1

Terrell Unit of the Texas Department of Corrections in Livingston, Texas, pursuant to a judgment of conviction and sentence of death.

2. Petitioner is indigent and is unable to pay the fees and costs of this action or to give security therefore.

### III. HISTORY OF PRIOR PROCEEDINGS

3. Petitioner was charged and indicted by a Smith County grand jury with the offense of capital murder arising out of the death of Christina Muse alleged to have occurred on or about May 19, 1998. On March 23, 2000, the jury rendered a verdict of guilty to the offense of capital murder.

4. On March 30,2000, the jury returned a verdict on the special issues and the trial court sentenced Applicant to death.

5. On April 24, 2002, Petitioner undertook a direct appeal in cause number 73,816 to the Texas Court of Criminal Appeals. The judgment and sentence of the trial court was affirmed in an unpublished opinion rendered on November 25, 2002. **Clark v. State**, 73,816 (Tex. Crim. App. November 25, 2002) (not designated for publication)

2

6.   On July 25, 2002, Petitioner filed his Application for Writ of Habeas Corpus under Article 11,071, Texas Code of Criminal Procedure.   This Writ raised substantial issues of constitutional dimension which were not litigated in the trial court nor raised by any evidentiary hearing prior to the filing of said Application for Writ of Habeas Corpus under Article 11.071, Texas Code of Criminal Procedure.

7.   On January 7, 2003, the trial court entered an order refusing to hold an evidentiary hearing on Petitioner's Application.

8.   On May 2, 2003, State District Judge Kerry L. Russell issued his findings of fact and conclusions of law recommending that Petitioner's Application for Writ of Habeas Corpus be denied.   Those findings and conclusions were summary in nature and superficial in depth.   Such findings are open to review on collateral attack in federal court.   Judge Russell's findings of fact fail to address many of the legal issues or new evidence attached as exhibits to the Application.

9.   Although the factual findings that were entered by Judge Russell might otherwise be otherwise presumed correct by virtue of 28 U.S.C. §2254(d), Petitioner will demonstrate that such factual findings are not

3

fairly supported by the trial record, upon which Judge Russell's findings in large part rely. Such presumption of correctness therefore cannot lie under 28 U.S.C. § 2254 (d) (8).

10. On October 1, 2003, the Texas Court of Criminal Appeals denied Petitioner's Writ of Habeas Corpus. See ex parte Clark, No. WR-55,996-01 (Tex. Crim. App. October 1, 2003). This is Petitioner's first Petition for Writ of Habeas Corpus filed with this Court.

### IV.   EXHAUSTION OF STATE REMEDIES

11. Petitioner presents claims in this Application for Writ of Habeas Corpus that are of constitutional dimension and that have been denied by the convicting court and by the Texas Court of Criminal Appeals.

### V.   BASIS OF THIS APPLICATION

**1.   Counsel Failed to Investigate or Present Evidence Which Would Have Mitigated Against the Imposition of the Death Penalty.**

#### Background

The principle ground upon which counsel rendered ineffective assistance to Mr. Clark involves trial counsel's failure to investigate and develop facts material to Mr. Clark's punishment.   Counsel failed to investigate Mr. Clark's family background, or his social, medical and mental history.   Mr. Clark's trial counsel could have investigated and presented a

4

wealth of evidence relevant to such mitigating factors at trial, but failed to do so.

The Texas state trial court's decision in Petitioner's case is irreconcilable with the Supreme Court's recent decision in *Wiggins v. Smith*, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003) and is accordingly an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), in light of *Wiggins*. In *Wiggins*, the petitioner's attorneys failed to investigate and present mitigating evidence of his "dysfuntional background" despite having some information available to them in a presentence investigation report and social service records. These indicated that the petitioner had suffered severe physical and sexual abuse as a child, had an alcoholic mother, and was borderline retarded with an IQ of 79. *See Wiggins* at 2532, 2536. The Supreme Court held that, under *Strickland*, the concern was not whether "counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was *itself unreasonable*." *Id*. at 2536. The Court concluded that, given the information in the presentence report and the social services reports, counsel's decision not to expand the investigation into Wiggins' life history fell short of professional standards, *id*. at 2536-38, and that Wiggins was prejudiced by counsel's failure.

5

"[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (citation omitted). "In assessing counsel's performance, we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Id.* at 237. The focus of this inquiry is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigation evidence ... *was itself reasonable.*" *Wiggins* at 2536.

In the present case, Petitioner's trial counsel did not conduct a reasonable investigation. Attached hereto as Exhibits 1-3 are the itemized statements submitted by Petitioner's trial counsel and their investigator for services rendered in relation to representation of Petitioner. The statements of Petitioner's trial attorneys reflect that no time was spent in investigation of a mitigation case. The investigator's billing records reflect that on March 27, 2000, the date Petitioner's punishment case began, he spent four (4) hours "attempt[ing] to locate and interview Troy Clark family members as witness's in punishment trial," and that on the following day, he "contacted family

6

members of Troy Clark and names of witness's Clark provided to attorneys and investigator for punishment trial." Finally, the investigator's billing reflects that the day before the jury answered the special issues in a manner requiring imposition of a death sentence, the investigator "traveled to Smith County Jail met with Lt. Folmer reference witness's at jail for Troy Clark including jailers Clark wanted to call as character witness's for him" and that "Lt. Folmer advised no jailer would be allowed to testify in behalf of Clark."

Standard practice in Texas capital cases at the time of Petitioner's trial included the preparation of a social history report. Petitioner's trial counsel never sought funds to retain a forensic social worker. As such, their conduct fell short of the American Bar Association's capital defense work standards. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added) Despite these well-defined norms, however, Petitioner's counsel failed to conduct any investigation of Petitioner's background. Cf. *id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, *family and*

7

*social history*, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 )"The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing ....Investigation is essential to fulfillment of these functions").

Although an evidentiary hearing is required to fully develop this evidence, facts known at this time showing the existence of additional mitigating factors are detailed in the accompanying affidavit of Cleta Barrington, Mr. Clark's mother, attached hereto as Exhibit 4 and incorporated herein by reference. Mr. Clark's background is marked by family abandonment, rejection, and substance abuse. Mr. Clark's mother suffered from a drug addiction, which she often supported by prostitution. C. Barrington Aff. Par. 3. Thus, virtually from birth, Mr. Clark was exposed to sexual promiscuity and insatiable drug usage. As a result of his mother's addiction, Mr. Clark effectively lost his mother, who was sent to prison on his first birthday and was repeatedly incarcerated thereafter for the remainder of Mr. Clark's life. C. Barrington Aff. Par. 3. Not only was Mr. Clark effectively abandoned by his mother, his father failed to have any parental relationship with him. C. Barrington Aff. Par. 4. Mr. Clark's only other father

8

figures were Mr. Roy Hattaway and Mr. Buddy Hensley.     Mr.
Hattaway was an alcoholic and Mr. Hensley often subjected Mr.
Clark to physical abuse. C. Barrigton Aff. Par. 6.     To avoid
such abuse, and to avoid placement in foster care, at age 15,
Mr. Clark's mother gave consent for him to marry.   As a result,
Mr. Clark was forced to live on his own from the time he was 15
years of age.  C. Barrington Aff. Par. 7.

Mr. Clark never had a stable home nor a nurturing familial
relationship as he was constantly moved from home to home.   C.
Barrington Aff. Par. 5.   Not only did Mr. Clark suffer at home,
he was constantly the subject of torment and ridicule at school.
Mr. Clark was born with a cleft palate, causing speech problems.
C. Barrington Aff. Par. 2.

When Mr. Clark was 20 years of age, his brother, Wilburn
Clyde Clark, Jr., committed suicide by placing a shotgun in his
mouth and pulling the trigger.    Mr. Clark had always felt
responsibility for his brother's death because they had fought
the night before the suicide.  C. Barrington Aff. Par. 8.

Despite the ready availability of such mitigating evidence,
trial counsel failed to investigate or present this evidence
during the sentencing phase of Mr. Clark's trial.   Incredibly,
neither of Mr. Clark's trial attorneys' nor any investigator
working on their behalf, ever contacted Mr. Clark's mother to
inquire about Mr. Clark's family history or personal history.

9

C. Barrington Aff. Par. 9. Deprived of this evidence, the jury
lacked the information necessary to properly assess whether Mr.
Clark deserved to die.  Accordingly, Mr. Clark's trial counsel
clearly rendered ineffective assistance.

Discussion

The purpose of a sentencing hearing is to provide the jury
with the information necessary for it to render an
"individualized sentencing determination . . . [based upon] the
character and record of the individualized offender and the
circumstances of the particular offense. *Penry v. Lynaugh*, 492
U.S. 302, 316 (1989) (citing *Woodson v. North Carolina*, 428 U.S.
280, 304 (1976)); see also *Amstrong v. Dugger*, 833 F.2d 1430,
1433 (11th Cir. 1987) ("the major requirement of the penalty
phase of a trial is that the sentence be individualized by
focusing on the particularized characteristics of the
individual.")  "The sentencing stage of any case, regardless of
the potential punishment, is 'the time at which for many
defendants the most important services of the entire proceeding
can be performed.'" *Vela v. Estelle*, 708 F.2d 854, 964 (5th Cir.
1983), *cert. denied*, 464 U.S. 1053 (1984).  Where the potential
punishment is death, as in the instant matter, the sentencing
proceeding takes on added importance.

The Supreme Court enunciated a two-prong test for analyzing
an ineffective assistance of counsel claim in *Strickland v.*

10

*Washington*, 466 U.S. 668 (1984).  According to *Strickland*, first, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687.

A.   Performance

### 1.   Failure to investigate

It is clear that defense counsel's failure to investigate the basis of his client's mitigation defense amounts to ineffective assistance of counsel. *See*, Wiggins, Id.; Williams *V. Taylor*, 529 U.S. 362 (2000).  When considering a failure to investigate claim the Supreme Court has said, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Under *Strickland*, Petitioner must show that his trial counsel's "acts or omissions" were not "the result of reasonable

11

professional judgment." *Strickland*, 466 U.S. at 690.   In the instant case, trial counsels' failure to conduct an investigation of Mr. Clark's background and resulting failure to present mitigating evidence at the sentencing hearing did not constitute reasonable professional judgment.   In preparing for a death penalty case, "a[n] attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir.) (citing *Thompson v. Wainwright*, 787 F.2d1447, 1450 (11th Cir. 1986), *cert denied*, 481 U.S. 1042 (1987).   "The failure to do so may render counsel's assistance ineffective." *Baxter v. Thomas*, 45 F. 3d 1501, 1513 (11th Cir.), *cert denied*, 516 U.S. 946 (1995).

In scrutinizing counsel's performance, the courts make every effort to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, and do not assume that counsel's performance is deficient "merely because we disagree with trial counsel's strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).   But with that said, it is indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983).   In assessing counsel's performance, a reviewing court should look to such

factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal v. Puckett*, 286 F. 3d 230 (5th Cir. 2002)

In the instant case, trial counsel did not conduct any interviews of witnesses familiar with Mr. Clark's background. They did not retrieve or review "any records having to do with Mr. Clark's background, medical history, school history, history of drug use, prior convictions, prior incarcerations, or any other material relevant to Mr. Clark's history. As a result of their failure to investigate, they did not uncover or present evidence of Mr. Clark's absolutely horrendous family history.

(a)   Mr. Clark's "refusal" to allow trial counsel
      to subpoena his mother and father

It is anticipated that the State will argue that defense counsels' failure to investigate for potential mitigating evidence is somehow excused by the fact that Mr. Clark stated during the punishment hearing that he did not want his mother or father to be subpoenaed to testify. RR (57,110)  However, this argument must fail.  The affidavit of Mr. Clark's mother clearly establishes that she had never been contacted by trial counsel or an investigator employed on their behalf.   Trial counsel could not have possibly known of the substance of her testimony. Accordingly, they could not have conceivably discussed with Mr.

Clark, the benefits and disadvantages of calling her to the stand. Despite Mr. Clark's statement that he did not want to call his mother or father to the stand, appellate courts have repeatedly held that lawyers may not "blindly follow" such commands.    Although the decision whether to use mitigating evidence is for the client, "the lawyer must first evaluate potential avenues and advise the client of those offering possible merit." *Thompson v. Wainwright*, 787 F.2d at 1451; *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998). In other words, such a course of action "must flow from an informed decision." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.), *cert denied*, 493 U.S. 1011 (1989); *Bouchillon v. Collins*, 907 F2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.")

Similarly, *Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the decision, do not serve any conceivable strategic purpose. *See Strickland*, 104 S. Ct. at 2061 ("Counsel may not exclude certain lines of defense for other than strategic reasons."    *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) (explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant), *cert. denied*, 519 U.S. 1120 (1997); *Loyd v. Whitley*, 977 F.2d 149,158 (5th Cir.1992) ("whether counsel's omission served a strategic

purpose is a pivotal point in *Strickland* and its progeny.  The crucial distinction between strategic judgment calls and just plain omissions has echoed in the judgments of this court.") *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (*Strickland* does not require deference to decisions which do not yield any conceivable benefit to the defense); *Wilson v. Butler*, 813 F.2d 664,672 (5th Cir. 1987) (remanding for evidentiary hearing because record did not reflect whether counsel made a strategic decision not to present mitigating evidence of troubled background and mental impairment); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir.1984) (explaining strategic purpose motivating counsel's decision to limit investigation by excluding implausible lines of mitigating evidence.)

Here, counsels' failure to present mitigating evidence is not entitled to deference because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Mr. Clark's defense.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 104 S. Ct. at 2006. Counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). But strategic decisions made without an adequate investigation into the facts and law controlling plausible

15

defensive theories are reasonable only to the extent that reasonable professional judgment supports counsel's limitation on the investigation. *Strickland*, 104 S. Ct. at 2066.

To be clear, we are dealing here with counsels' complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Mr. Clark's trial. The fact that trial counsel never contacted Mr. Clark's mother amply demonstrates a complete failure to investigate family background as such contact is perhaps the first made by attorneys in such a pursuit. The complete failure to search for mitigation distinguishes this case from those cases in which appellate courts have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash. *See, e.g., Darden v. Wainwright*, 477 U.S. 168 (1986) (counsel's failure to present mitigating evidence relating to defendant's character, psychiatric evaluation and history as a family man did not constitute deficient performance where such evidence would have opened the door to otherwise excluded evidence that defendant had prior convictions, was diagnosed as a sociopathic personality, and had in fact abandoned his family).

Given that counsels' conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, there is no strategic decision entitled to deference. Moreover, there does not appear any justification for limiting, or in this case, completely omitting, any investigation into Mr. Clark's background. As with counsels' failure to investigate, we are dealing with a complete, rather than partial, failure to offer any mitigating evidence on Mr. Clark's behalf. Therefore, trial counsels' failure to investigate and offer any mitigating evidence relating to Mr. Clark's background was professionally unreasonable and deficient performance in the context of this case.

Mr. Clark's lawyers can offer no rational strategic explanation for their behavior. With their client's life at stake, these attorneys quite simply failed to investigate or produce the only evidence that offered a realistic chance of saving Mr. Clark from execution. Their abject failure stemmed not from a conscious decision to adopt an alternative strategy, but from sheer negligence. The Sixth Amendment will not tolerate such incompetence, particularly when a defendant's life hangs in the balance.

B.    Prejudice

Without doubt, Mr. Clark has satisfied the first *Strickland*
requirement by establishing the deficiency of his counsels'
performance at the sentencing hearing.   Nonetheless, before Mr.
Clark can prevail on his claim of ineffective assistance at
sentencing, *Strickland* also requires that he make a showing of
prejudice.   In order to obtain relief from this court, Mr. Clark
must demonstrate "that there is a reasonable probability that,
but for counsel's error, the result of [his sentencing hearing]
would have been different."  *Strickland*, 466 U.S. at 694.   In
gauging the likelihood of prejudice, the *Strickland* Court
defined "a reasonable probability" as "a probability sufficient
to undermine confidence in the outcome."  *Id.*

This discussion must begin with a reminder that this ground
focuses on the penalty phase of a capital case.   In this phase,
the jury has considered evidence which convinced them of the
defendant's guilt and is determining whether the defendant
should live or die.   The defense role in the penalty phase is to
present evidence to convince each member of the jury not to vote
to have the defendant killed.   To achieve this goal, defense
counsel should humanize his client, overcome the common
prosecutorial position that the defendant is evil, and to
provide the jury with reasons for the conduct by explaining the

forces in the defendant's life that could have led up to the circumstances of murder.

The Eighth Amendment to the Constitution states "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In a capital case, it requires that the death penalty be appropriate punishment in a specific case, and that it can only be imposed after adequate consideration of factors that might warrant mercy. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *California v. Brown*, 479 U.S. 538, 554 (1976). Mitigating evidence allows the consideration of "compassionate or mitigating factors stemming from the diverse frailties of humankind … [and] constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. at 304. *See also Skipper v. South Carolina*, 476 U.S. 1 (1986). The sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), *See also Lockett v. Ohio*, 438 U.S. 586 (1978).

In determining prejudice, the court is required to compare the evidence actually presented at sentencing with all the mitigating evidence contained in the post-conviction record.

Stated to the point: Is this additional mitigating evidence so
compelling that there is a reasonable probability at least one
juror could reasonably have determined that because of Mr.
Clark's reduced moral culpability, death was not an appropriate
sentence?

The sentencing process consists of weighing mitigating and
aggravating factors, and making adjustments in the severity of
the sentence consistent with this calculus. *Vela v. Estelle*,
708 F.2d 954,965 (5th Cir. 1983), *cert. denied* 464 U.S. 1053
(1984). The additional mitigating evidence has been described
in detail above. It seems indisputable that this new evidence,
standing alone, presents a hugely sympathetic case for
mitigating a death sentence. The affidavit of Mr. Clark's
mother contains substantial evidence that his childhood was
marked by physical and emotional deprivation and abuse. *See*
*Penry v. Lynaugh*, 492 U.S. 302 (1989) (quoting *California v.*
*Brown*, 479 U.S. 538 (1987) (O'Conner, J. concurring) for
proposition that "evidence about the defendant's background is
relevant because of the belief, long held by this society, that
defendants who commit criminal acts that are attributable to a
disadvantaged background, or to emotional and mental problems,
may be less culpable than defendants who have no such excuse")
*id.* (discussing the significance that mitigating evidence of
childhood abuse and mental retardation have with respect to the

individualized sentencing determination required by the Eighth
Amendment for imposition of the death penalty); *Eddings*, 102
S.Ct. at 877 ("evidence of a turbulent family history, of
beatings by a harsh father, and of severe emotional disturbance
is particularly relevant" to an individualized sentencing
determination). Specifically, Mr. Clark's background reveals an
addict for a mother who supported her habit by resorting to
prostitution, exposing him to sexual promiscuity and the common
personality pitfalls of drug usage. A mother who was
incarcerated for significant periods of time from Mr. Clark's
first birthday throughout the remainder of his life. A father
who was never around and who utterly failed in his duty to mold
Mr. Clark's character. A surrogate father figure who was an
alcoholic and another who physically abused Mr. Clark. A young
man who was brought up in what can be best described as a total
lack of a stable home environment. A young man, who at the age
of 15, was compelled to face the pressures of a world that most
do not face until substantially later in their adult life. This
evidence would have provided some counterweight to evidence of
bad character which was in fact received by the jury. *See Blake
v. Kemp*. 758 F.2d 523, 535 (11th Cir. 1985), *cert. denied*, 474
U.S. 998 (1985).

Counsels' lack of effort at the punishment phase of trial
deprived Mr. Clark of the possibility of bringing out even a

single mitigating factor.    Mitigating evidence clearly would
have been admissible.    The jury would have considered it and
possibly been influenced by it. [1]   Accordingly, Mr. Clark's writ
should be granted, entitling him to a new sentencing hearing.

---

[1]       Several courts have found prejudice under similar circumstances. *See Dobbs v. Turpin*, 142 F.3d
1383, 1389-91 (11th Cir. 1998) (counsel's complete failure to investigate and present mitigating evidence
at the punishment phase was prejudicial where such evidence was available); *Smith v. Stewart*, 140 F.3d
1263 (9th Cir. 1998), *cert denied*, 525 U.S. 929 (1998) (counsel's complete failure to investigate and
present any mitigating evidence at the punishment phase was prejudicial where such evidence was
available); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998) (failure to
present mitigation evidence was prejudicial where several relatives, friends, death penalty experts, and a
minister were available to testify); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) *cert. denied* 522
U.S. 907 (1997)  (holding defense counsel's performance ineffective and prejudicial at sentencing where
he failed to make a significant effort, based on reasonable investigation and logical argument, to ably
present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors);
*Glenn v. Tate*, 71 U.S. 910 (1996) (defendant's lawyers inadequate preparation for sentencing phase was
prejudicial where they did not acquaint themselves with defendant's social history, never spoke to any of
his numerous brothers and sisters, never examined his medical records, or talked to his probation officer);
*Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (prejudicial impact where counsel failed to provide any
assistance at a sentencing hearing); *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989), *cert. denied*, 493
U.S. 874 (1989) (substandard argument and the presentation of no evidence was prejudicial where fifteen
character witnesses were available to testify at the sentencing hearing; and it amounted to no
representation at all).

2. **Trial Counsel's Closing Argument was Ineffective Because Defense Counsel Demonstrated a Personal Antipathy Toward Mr. Clark and Abdicated His Role as an Advocate.**

The Sixth Amendment right to counsel "is the right to the *effective* assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)(emphasis added) This right is driven by the rationale that the effective assistance of counsel is necessary to safeguard the right to a fair trial: "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *United States v. Cronic*, 466 U.S. 648, 654 n. 8 (1984) (quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932); *see also Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986) ("Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have.")

The overarching test for effective assistance of counsel is whether the defendant's attorney subjected the prosecution's case to meaningful adversarial testing. *Strickland*, 466 U.S. at 686 ("the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). The right to

effective assistance of counsel is thus the right of the accused
to require the prosecution's case to survive the crucible of
meaningful adversarial testing.    When  a  true  adversarial
criminal trial has been conducted -- even if defense counsel may
have made demonstrable errors - the kind of testing envisioned
by the Sixth Amendment has occurred. But if the process loses
its  character  as  a  confrontation  between  adversaries,  the
constitutional guarantee is violated. *Chronic*, 466 U.S. at 656-
57.  The premise of an adversarial system in which the defendant
has  an  effective  advocate  for  his  side  "underlies and gives
meaning to the Sixth Amendment. It is meant to ensure fairness
in the adversary criminal process.  Unless the accused receives
effective  assistance  of  counsel,  a  serious  risk  of  injustice
infects the trial itself." *Id.* at 655-56.

Effective assistance also requires that an attorney adhere
to his duty of undivided loyalty to his client.  *Strickland*, 466
U.S.  at  692.     This  duty  includes  acting  as  a  meaningful
adversary vis-a-vis the state.

The right to counsel guaranteed by the Constitution
contemplates the services of an attorney devoted
solely to the interests of his client…. And nowhere is
this  service  more  honorable  than  in  a  case  of
appointment to represent an accused too poor to hire a
lawyer, even though the accused may be a member of an
unpopular or hated group, or may be charged with an
offense which is particularly abhorrent.

24

*Osborn v. Shillinger*, 861 F.2d 612, 624-25 (10th Cir. 1988)
(quoting *Von Moltke v. Gillies*, 332 U.S. 708, 725-26 (1948)).
Thus the duty of loyalty is violated not merely when counsel
represents clients who have conflicting interests, but also when
counsel acts more for the benefit of, and with more apparent
sympathy toward, the prosecution than the client he is
defending.  *See id*. at 625 (quoting *Cronic*, 466 U.S. at 666)
("an attorney who adopts or acts on a belief that his client
should be convicted 'fail[s] to function in any meaningful sense
as the Government's adversary.'")

Here, the most egregious errors and omissions by trial
counsel cannot be explained solely by a failure to investigate
Mr. Clark's case but rather point to counsel's failure to act as
a diligent and loyal advocate for his client.  "An effective
attorney 'must play the role of an active advocate, rather than
a mere friend of the court.'" *Osborn*, 861 F.2d at 624 (quoting
*Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *see also Cronic*, 466
U.S. 648, 656-57 ("if the process loses it character as a
confrontation between adversaries, the constitutional guarantee
is violated.").  Indeed, as was stated in *Osborn*, the duty of
loyal advocacy is more vital to effective assistance than the
absence of third party conflicts of interest:

> [A]n attorney who is burdened by a conflict between
> his client's interests and his own sympathies to the
> prosecution's position is considerably worse than an

attorney with loyalty to other defendants, because
interests of the state and the defendant are
necessarily in opposition.

*Id.* at 629.

If any doubt remains that Mr. Clark's counsel was
ineffective at the penalty phase, it is erased by counsel's
closing argument. An argument which was interrupted by the
trial judge who voiced concerns that trial counsel was "trying
to create some kind of reversible error . . . by saying that you
[Mr. Clark's counsel] did not care. . . [by] keep [repeating]
that you don't care what they [the jury] do basically." RR(58,
32). The relevant portions of the closing argument by Mr.
Clark's counsel are as follows:

MR. NASH: I guess about 9 p.m. yesterday evening after
about my fifth beer, I asked Mr. Mims. I'm scratching my head
now wondering why I asked that. I don't have a whole lot to say
to you guys. There's not a whole lot of good things I can say
about Troy Clark either. And perhaps at this stage, you're no
too interested in what I've got to say. I don't have a whole
lot to say. But I was wondering after that spectacle yesterday
evening, where are we? Was Troy Clark getting up on that
witness stand the very last moments of the evening taunting you
and manipulating you to give him a death sentence or did he
actually give up? I don't know – and at this point I don't
really care, to tell you the truth. Because I'm not sure it

makes a whole hell of a lot of difference.  If anything I say to you, you don't agree with, that's fine.

We've been through a lot together the past two weeks.  I saw the evidence that came out.  I'm not going to fuss at your verdict.  It really didn't surprise me a whole lot with all that evidence with all of that what?  Two weeks of testimony.  That really didn't surprise me a whole lot.  I'm not going to fuss at you.

We spent what three days in punishment starting Monday.  We didn't parade any character witnesses up here and tell you he's not such a bad guy.  You know, we couldn't find a single relative that would say those kind of things.  Where did that leave us?  Where are we left?  You know, in all irony, the only one who professed any type of regard for him was Tory Gene Bush.  Some type of love I'll never fathom.  Who probably single handedly will send him to death row but still loves him.  Don't ask me to explain it.  I haven't a clue.  It's very possible you don't like Troy Clark after all you've seen, after all you've heard and, you know, I really don't care at this point, I really don't care. Because you know if that's your sentiment, I share it.  To say that this has been a pleasure, to say, suggest that this has been an easy case to defend would be highly disingenuous.  Troy Clark has probably been the most difficult

27

client I've ever had to represent.    In fact, he is the most
difficult client I've ever had to present.

        THE COURT:    Let me ask the attorneys approach the bench,
please.  Now, you're testifying.  Are you trying to create some
kind of reversible error?

        MR. NASH:  No, Your Honor.

        THE    COURT:    By  saying  you  don't  care?    Is  this  a
strategical move?

        MR. NASH:  No, Your Honor.

        MR. CLARK:  Your Honor, can I fire him?

        MR. NASH:  That's not where I'm going.

        THE COURT:  You keep saying you don't care what they do
basically.   I mean I don't understand the strategy here.    If
you're trying to create some kind of reversible error by not
giving him a fair argument on sentencing, I can't allow that to
go on.

        MR. NASH:  If you'll let me finish.

        THE COURT:  All right.  See where you're going.

RR(58, 30-32)

                                  . . .

        MR. NASH:  You know, when Troy got up on the witness stand
and if you think that's taunting or you think he gave up, either
way it is for you to decide.  The thing is, you decide.  It's
not Troy Clark's decision of whether or not he gets death or

                                  28

life.   It falls to you.   If you think he was trying to manipulate you, taunt you, dare you to sentence him to life, well, if that's the opinion you raised, you can call his bluff and find that the evidence will support the answers that would dictate a death sentence, then that's your judgment.

RR(58, 33-34)

As stated previously, Mr. Clark's counsel failed to introduce any mitigating evidence at the punishment phase of trial.   Trial counsel then proceeded to make a closing argument to the jury that was not simply weak; it constituted an apology for having served as Mr. Clark's counsel.   In his argument, trial counsel effectively distanced himself from his client and communicated to the jury that his presence was an obligatory part of the American system of justice.   In effect, counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible crime.   "[R]eminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused."   *Goodwin v. Balkcom*, 684 F.2d 794, 806 (11th Cir. 1982).   Rather than attempting to humanize Mr. Clark, counsel in his closing argument stressed the inhumanity of the crime.

Counsel's closing argument also failed to focus the sentencing jury's attention on "the character and record of the

29

individualized offender and the circumstances of the particular offense…." *Penry*, 492 U.S. at 316 (citing *Woodson*, 428 U.S. at 304); *see also Armstrong*, 833 F.2d at 1433 ("[Petitioner's] trial counsel failed to provide the jury with the information needed to properly focus on the particularized characteristics of this petitioner."). Also, counsel never asked the jury to have mercy on Mr. Clark, to spare Mr. Clark's life or to sentence Mr. Clark to life imprisonment. Instead, he merely asked the jury to impose a sentence with which they could live. This failure also demonstrates deficient performance. *See, e.g., Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert denied* 503 U.S 952 (1992) (holding that a sentencing argument that included "[m]aybe [the defendant] ought to die, but I don't know" to be inadequate). In the instant case, counsel's argument effectively relieved the jury of any doubt or anguish it might feel in sentencing Mr. Clark to death. Accordingly, counsel's argument resulted in the "breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696.

Counsel's punishment argument could have taken no more than 5 minutes to present. He cannot be said, under any standard, to have done a competent job in the brief time he spent. At times, counsel expressed empathy with the prosecution and resignation that he would not be able to persuade the jury in any event. At

others, he made comments that do not appear relevant to any
conceivable issue in the case.     In the context of the rest of
his sometimes disoriented argument, counsel seems to have been
free-associating or saying whatever came into his mind at the
moment.     The   argument   smacks   of   lack   of   preparation   and
organization.    Counsel was, as some like to put it, simply
talking out loud or talking off the top of his head.     In this
case   he   unfortunately   failed   to   consider   what   effect   that
undisciplined exercise might have on the jury's deliberations.

     Counsel's   argument   told   the   jury   that   it   need   not   be
concerned about the awesome function it was performing.     Thus,
counsel removed the chief obstacle to most jurors' willingness
to vote for a death sentence --- individual conscience and the
fear that an error in judgment may led to the wrongful taking of
another person's life.     As a result, counsel violated the most
basic duty of a defense attorney in a capital case: to seek as
zealously as possible within the bounds of the law to prevent
the defendant from being executed.

     3.    The    Cumulative    Effect    of    the    Failure    to
           Investigate and Present Mitigating Evidence and
           Counsel's Deficient Closing Punishment Argument
           is   in   Itself   a   Violation   of   Mr.   Clark's
           Constitutional Rights.

     If   trial   counsel's   failure   to   investigate   and   present
mitigating   evidence   and   trial   counsel's   deficient   closing
punishment argument do not independently result in a violation

31

of Mr. Clark's constitutional rights, the cumulative effect of these deficiencies certainly deprived Mr. Clark of his constitutional rights as guaranteed by the Texas Constitution and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The combination of trial counsel's deficient performance constructively denied Mr. Clark any defense at all in the penalty phase of trial. Clearly, Mr. Clark would have been prejudiced if the trial court had not permitted him to put on mitigating evidence at the penalty phase, no matter how overwhelming the State's showing of aggravating circumstances. "Actual or constructive denial of assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692. "Prejudice in these circumstances is so likely that a case-by-case inquiry into prejudice is not worth the cost.

Counsel's lack of effort at the punishment phase of trial deprived Mr. Clark of the possibility of bringing out even a single mitigating factor. Mitigating evidence would have been admissible. The jury would have considered it and possibly been influenced by it. Accordingly, a reasonable probability exists that Mr. Clark's sentence would have been less severe had the jury balanced the aggravating and mitigating circumstances, particularly in light of the fact that the jury ultimately

sentenced him to death.   As a result, Mr. Clark has shown that
he was substantially prejudiced by his trial counsel's complete
failure during the punishment phase.  *See, Milburn v. State*, 15
S.W.3d 267 (Tex. Crim. App. 2000); *Ex parte Felton*, 815 S.W.2d
733, 737 n. 4 (Tex. Crim. App. 1991).

4. **Trial Counsel was Ineffective During the Guilt/Innocence Portion of Trial for "Opening the Door" and Allowing Extraneous Evidence of Another Murder Alleged to Have Been Committed By Mr. Clark.**

5. **Introduction of Extraneous Evidence of Another Murder Alleged to Have Been Committed By Mr. Clark During the Guilt/Innocence Stage of His Trial Resulted in a Deprivation of Due Process.**

BACKGROUND

Mr. Clark had originally been indicted for two different
offenses, the instant case involving the death of Christina Muse
and another case involving the death of one Tracy Mize Socia.
Prior to trial, defense counsel filed a Motion in Limine seeking
to preclude the State from introducing evidence regarding the
Mize murder case.   Said motion was granted by the trial court.
RR(33,28)  Thereafter, while Tory Bush was testifying during the
guilt/innocence portion of Mr. Clark's trial, the following
occurred:

Prosecution:   What letters did he want you to write about
the Christina Muse situation?

33

Ms. Bush:       He wanted me to change the whole story.   He wanted me to lay the blame on two other people, and those two other people are dead.

Prosecution: … without going into who the other two people are, he wanted you to take the blame completely away from him and you?

Ms. Bush:       Yes.     Well,   it   wouldn't   have   took   it completely away from me.

RR(41, 101)

Mr. Clark's counsel then cross-examined Ms. Bush concerning the various versions of events she had previous given to law enforcement officials.

Defense:       All right.   And on that date, who did you say was involved in that killing.

Ms. Bush:       I think I said Tracy Mize was.

Defense:       Tracy Mize.   Tell us exactly what you told him.

Ms. Bush:       I can't tell you.  I lied.

RR(41, 141)

Mr. Clark's counsel then went on to establish that Tracy Mize had helped dispose of Muse's body and that Ms. Bush had entered into an agreement wherein she would cooperate and assist in the prosecution of Tracy Mize.   In exchange for her cooperation, Ms. Bush would be sentenced to thirty years. RR(41,

34

142)   Mr. Clark's counsel then established through Ms. Bush that while they were searching for the body of Christina Muse they found Tracy Mize's body instead. RR (41,142)   This was the first mention of Mr. Mize's death and it was brought about by Mr. Clark's own counsel.   In essence, Mr. Clark's counsel violated its own motion in limine.

The State then argued that the door had been fully opened to show Mr. Clark's alleged involvement in the death of Tracy Mize.   RR (41,148)   The trial court allowed Ms. Bush to testify regarding her purported knowledge of the facts of Mize murder, holding that the relevance of the testimony went to her credibility.   RR (41,159)

Tory Bush was then allowed to testify regarding the murder of Mr. Mize and Mr. Clark's purported involvement in his death. She testified that immediately before his murder, Mr. Mize and Mr. Clark traveled to Houston.   That shortly after returning, she and Mr. Clark went out to a trailer located on Ms. Young's property.   That when Mr. Clark opened the door to the trailer, Mr. Mize was sitting inside with his hands cuffed together. RR(42, 27-29)   The State then called additional witnesses who testified that the body of Tracy Mize was found in a septic tank in close proximity to where Ms. Muse's body was ultimately found.   The State also called a DPS firearms examiner to testify

that the bullets recovered from the body of Tracy Mize were consistent with those fired from Mr. Clark's gun.

## DISCUSSION

Had Mr. Clark's counsel not opened the door to admission of this extraneous offense, it is clear that evidence surrounding the death of Mr. Mize would not have been admissible during the guilt/innocence portion of trial.  It has long been held that evidence of other crimes or bad acts are not admissible to show the accused acted in conformity with that evidence in committing the crime for which he is charged. *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990)

It is equally clear that there could be no conceivable valid strategic trial strategy for defense counsel to open the door to this evidence.  If trial counsel's strategy was to impeach Ms. Bush by showing that she had previously lied in her statements to law enforcement officials, that objective was reached when she responded to a question by the State during direct examination that she had previously given a statement and that the statement was untrue. RR (41,141) Thus, trial counsels' performance was deficient when they opened the door to introduction of evidence concerning the murder of Tracy Mize.

There can be no doubt that Mr. Clark was prejudiced by introduction of this extraneous evidence.  This was not a case with overwhelming evidence of Mr. Clark's guilt.  There was no

36

2d23ec7737c41d7f

physical evidence clearly linking Mr. Clark with the commission of the offense. There were no fingerprints, no DNA evidence and no testimony conclusively establishing that the duct tape used to restrain Ms. Muse and the concrete found covering her body were the same that had been in Mr. Clark's possession. Accordingly, Mr. Clark's writ should be granted.

     5.    **Trial Counsel was Ineffective During the Guilt/Innocence Portion of Mr. Clark's Trial for Allowing Extraneous Evidence of the Kidnapping/Assault of Wesley Crocker to be Admitted.**

     6.    **Introduction of Extraneous Evidence of the Kidnapping/Assault of Wesley Crocker During the Guilt/Innocence Stage of Mr. Clark's Trial Resulted in a Deprivation of Due Process.**

BACKGROUND

During the guilt/innocence portion of trial, Amber Scroggins testified that she had seen a stun gun at Mr. Clark's residence. Without an objection by the defense attorneys, Ms. Scroggins was also allowed to testify that Mr. Clark had bragged about using the stun gun on Wesley Crocker. RR(35, 29) As a direct result of trial counsels' omission, Wesley Crocker was allowed to testify regarding an extraneous incident involving Mr. Clark.

Mr. Crocker testified that he owed Mr. Clark money for drugs. When he did not timely pay his debt, Mr. Clark arranged for two other individuals to abduct him and bring him to a shop

37

owned by Mr. Clark's cousin. When Mr. Crocker arrived at the shop, Mr. Clark hit him with a tire iron and shocked him repeatedly with a stun gun. RR (36, 85-92)

Mr. Clark then took Mr. Crocker home and continued the assault by hitting Mr. Crocker with a wire brush and using the stun gun again. During the period of the second assault, Mr. Clark made the statement "it's tough not knowing whether your going to live or die". RR (36, 93-97) Ultimately, Mr. Clark released Mr. Crocker with the understanding that he would work off his debt by assisting in the remodeling of Mr. Clark's home. RR (36, 101)

### DISCUSSION

Trial counsels' failure to object to Ms. Scroggins testimony that she had previously heard Mr. Clark brag about using the stun gun on Mr. Crocker led directly to the admission of testimony concerning this extraneous offense from Mr. Crocker himself. Trial counsel was clearly deficient in this regard.

Admission of this testimony not only established Mr. Clark had a propensity for violence, it also established a pattern of use of the stun gun by Mr. Clark. This fact is critically important considering that a stun gun was used during the murder of Ms. Muse. Thus, there can be no doubt that Mr. Clark's defense suffered prejudice as a result of trial counsel's deficient performance. As stated previously, this was not a

38

case with overwhelming evidence of Mr. Clark's guilt. There was no physical evidence clearly linking Mr. Clark with the commission of the offense. Accordingly, Mr. Clark's writ should be granted.

7.   **Trial Counsel was Ineffective for Failing to Object and Request an Immediate Curative Instruction Relating to the Trial Judge's Improper Comment on Mr. Clark's Credibility.**

8.   **Mr. Clark was Denied His Due Process Right to a Fair Trial When the Trial Judge Made an Improper Comment on Mr. Clark's Credibility.**

### BACKGROUND

During the guilt/innocence portion of trial, Mr. Clark elected to testify on his own behalf. On cross-examination, while the prosecution was inquiring about Mr. Clark's whereabouts after Ms. Muse's disappearance, the following transpired:

Prosecution:   Did you ever see her again after you drove out of the driveway?

Mr. Clark:   No, sir.

Prosecutor:   How long were you gone over to Blue's?

Mr. Clark:   I couldn't tell you no time. I mean, estimate three to four hours. I wasn't just at Blue's. You know, I had stopped by a few other friends' house.

Prosecutor:   Delivering drugs?

Mr. Clark:   Yeah.

Prosecutor:      Whose house did you stop at?   You're looking up there?

Mr. Clark:      I don't want to get nobody in trouble, but I guess I've got to tell the truth.

The Court:      Yeah.   You're supposed to.

RR (47, 126-27)

At this point the jurors, counsel and other spectators burst into laughter.   Mr. Clark's counsel not only failed to object to the trial judge's comment, they also failed to request an immediate curative instruction.

DISCUSSION

The rule in Texas governing discussion of evidence by the trial court is as follows:

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

Tex.Code Crim.Proc. Ann. Art. 38.05. In enacting this provision, the Legislature recognized the fact that the position of the trial judge carries great influence and that his opinion is naturally received by juries with deference.   In order to guard against an invasion by the judge of the province of the jury in

40

determining the credibility of the witnesses and the weight to
be given to their testimony, the statute was enacted.

Thus, it has long been a well established rule in the State
of Texas that a trial judge should studiously avoid making any
remark calculated to convey to the jury his opinion of the case
or of any fact issue raised by the evidence. *McClory v. State*,
510 S.W.2d 932, 934 (Tex. Crim. App. 1974). This rule is true
because jurors are prone to seize with alacrity upon any conduct
or language of the trial judge which they may interpret as
shedding light upon his view of the weight of the evidence, or
the merits of the issues involved. *Jones v. State*, 788 S.W.2d
834, 836 (Tex. App. - Dallas 1990, no pet.).

Reasonably professionally competent counsel would have been
familiar with this rule and the effects such a comment would
have on the jury in determining the credibility of an accused.
Thus, trial counsel's failure to object to the judge's comment
was deficient performance. Moreover, it cannot be argued that
the court's charge cured the error. "[T]o be effective, an
instruction to disregard must immediately follow the comment and
not await the reading of the charge. . .because a trial judge's
improper comment on the weight of the evidence, not at once
ordered to be disregarded by the judge's command, festers in the
jury's mind so as to increasingly benefit the State as the trial
progresses and so as to increasingly prejudice the defendant as

41

the trial progresses. *Bachus v. State*, 803 S.w.2d 402, 406-7 (Tex. App. - Dallas 1991). Indeed, although federal trial judges have the right to comment on the evidence, there are limitations. *See United States v. Dillon*, 446 F.2d 598, 601 (5th Cir. 1971) Where the federal trial court exceeds those limitations in its charge, the prejudicial effect of the charge cannot be cured by the court further instructing the jury in the charge that assessment of credibility of the witness was their exclusive function. *See Dillon*, 446 F.2d at 601.[2]

---

[2]     The seminal case stating this principle is *Quercia v. United States*, 289 U.S. 466, 469 (1933), in which the Supreme Court held: "It is within [the judge's] province . . . to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence. . . ." The Court reversed the defendant's conviction because the trial judge's observation that a witness wiping his hands while testifying was almost always an indication of lying was "a sweeping denunciation repudiat[ing] as a lie all that the accused had said in his own behalf. . . . This was error and we cannot doubt that it was highly prejudicial." *Id.* at 472. The Court added:

> Nor do we think the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury and that if they did not agree with it they should find the defendant not guilty. His definite and concrete assertion of fact . . .was not withdrawn. His characterization of the manner and testimony of the accused was a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence.

*Id.*

9.  **The Cumulative Effect of the Violations of Mr. Clark's Rights is in Itself a Violation of Mr. Clark's Constitutional Rights.**

The cumulative effect of state and federal constitutional and statutory infirmities in the trial of Mr. Clark's case as set forth above is itself a violation of Mr. Clark's constitutional rights as guaranteed by the Texas Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Mr. Clark prays that this Court:

1.  Issue a writ of habeas corpus vacating his unlawfully obtained conviction and sentence;

2.  Grant him a full and fair evidentiary hearing on all claims raised by this Petition;

3.  Grant him full and complete discovery pending said evidentiary hearing, such discovery to include, but not limited to, the contents of the District Attorney's files in his case and the right to take depositions and to obtain subpoenas for witnesses and documents necessary to the resolution of the claims raised herein;

4.  Grant Mr. Clark such other and further relief as may be just and proper.

Respectfully submitted,

**CRAIG L. HENRY**
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504
(903) 792-4645
Fax (903) 792-5073


By _____
CRAIG L. HENRY
Arkansas Bar # 90142
Oklahoma Bar # 016779
Texas Bar # 09479260
Attorney for Applicant

**STATE OF TEXAS**

**COUNTY OF BOWIE**

### AFFIDAVIT OF VERIFICATION

Before me, the undersigned authority, on this day personally appeared Craig L. Henry who, being duly sworn, stated as follows:

"My name is Craig L. Henry. I represent Troy Clark. I have communicated with Mr. Clark and I am authorized to state on his behalf that it is his desire to have a full and complete review at all federal courts of every issue that might result in a reversal of his conviction and sentence of death.

I have read the foregoing Application for Writ of Habeas Corpus. I am familiar with the factual matters set forth therein and they are, according to my information, knowledge and belief, true, correct and accurate."

FURTHER AFFIANT SAYETH NOT.

44

_____
Craig L. Henry

Subscribed and sworn to before me this 2nd day of March, 2004.



_____
Notary Public

### Certificate of Service

I certify that the foregoing pleading was served upon the Office of the Attorney General of the State of Texas, Postconviction Litigation Division, by delivering a copy to Deni S. Garcia, Assistant Attorney General, P.O. Box 12548 Capitol Station, Austin, Texas 78711, this 2nd day of March, 2004.

_____
Craig L. Henry
Counsel for Applicant

45

# EXHIBITS NOT SCANNED

# ORIGINALS ARE IN THE

# CLERK'S OFFICE