IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHAL DIVISION

| | | |
|---|---|---|
| TROY CLARK, | § | |
| Petitioner | § | |
| vs. | § | CIVIL ACTION NO. 2:03cv357 |
| DOUG DRETKE, Director Texas Department of Criminal Justice, Correctional Institutions Division | § § | |
| Respondent | § | |

**PETITIONER CLARK'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY RESPONDENT DRETKE AND REQUEST FOR EVIDENTIARY HEARING**

TO THE HONORABLE JUDGE T. JOHN WARD, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION:

TROY CLARK ("Clark"), Petitioner herein, by and through his appointed attorney of record, Craig L. Henry, files this response to Respondent's ("Dretke") motion for summary judgment and request for evidentiary hearing, and in support would show the Court as follows:

**1. Trial counsel's investigation and presentation of mitigating evidence at the punishment phase was constitutionally ineffective.**

Clark's trial counsel rendered ineffective assistance by failing to investigate and develop facts material to the punishment phase of Clark's trial. As demonstrated by the

affidavit of Clark's lead trial counsel, Bobby Mims, absolutely no mitigation investigation was conducted in this case. (Affidavit of Bobby Mims attached hereto as Exhibit "A" and incorporated herein by reference the same as set forth at length). In his affidavit, Mr. Mims acknowledges that neither he, nor his co-counsel, Kenneth Nash, attempted to retain a forensic social worker to prepare a social history, even though the State made funds available for that purpose. Nor did counsel attempt to obtain any records relevant to Clark's past. Nor did they attempt to obtain any documents or other evidence regarding Clark's background. Finally, trial counsel did not conduct any collateral interviews with Clark's parents, siblings, other family members, neighbors, teachers, principles or other school personnel, employers, co-workers, social workers, court personnel, coaches, ministers or other church personnel, or physicians or medical personnel in an attempt to discover potentially mitigating evidence or information. In connection with this lack of investigation and preparation of a mitigation case, Mr. Mims states:

> [a]t the time [Clark's] case was tried, mitigation practice was almost unknown. Shortly after [Clark] was sentenced to death, I attended a mitigation seminar at Southern Methodist University held by Niland, Wischkamper and Byington. As soon as the seminar started, I immediately realized that we most likely rendered ineffective assistance of counsel during the punishment phase of [Clark's] trial. It was

> simply a lack of training on my part. Moreover,
> I feel that the mitigation practice in general
> was embryonic and not well developed as a body of
> law at the time of [Clark's] trial.

In light of Mr. Mims' statements regarding mitigation practice as embryonic and not well developed as a body of law, it is important to note that Clark's capital trial was tried in the year 2000.

Had Clark's trial counsel performed effectively, they would have discovered a raft of mitigating evidence as demonstrated by the affidavit of Clark's mother, Cleta Barrington, (attached hereto as Exhibit "B" and incorporated herein by reference the same as set forth fully at length) and the affidavit of Shelli S. Schade, LMSW, DAPA, the mitigation investigator employed by undersigned counsel and attached hereto as Exhibit "C" and incorporated herein by reference the same as set forth fully at length. These affidavits establish that a unique set of factors contributed to Clark's social functioning, intellectual development and behavior. These factors which all have mental health consequences include, but are not limited to:

(1) his mother and father being first cousins;

(2) prior to his birth and continuing thereafter, Clark's mother suffered from drug addiction, which she supported by prostitution;

(3) his mother abused alcohol and drugs throughout her pregnancy with Clark, drinking beer, whiskey, vodka and "whatever she could get", she also used marijuana and stimulants during her pregnancy;

(4) Clark was born premature as a result of his mother becoming drunk at a local bar and being beaten by Clark's father;

(5) as a result of her addiction, Clark's mother had a lengthy criminal record. She was incarcerated while pregnant with Clark. She would return to prison on Clark's first birthday and would continue to be imprisoned on and off throughout most of Clark's life;

(6) Clark endured constant exposure to promiscuity, drugs, alcohol, criminal activity and violence. He often witnessed violence against his mother from her many male partners. During his early childhood, he witnessed a neighbor girl die from stabbing. He would later experience the suicide of his brother, the one stable person in his life;

(7) his father had very little to do with him and was hardly ever around;

(8) being born to a single and drug dependent prostitute, Clark was raised in chronic poverty, often being so hungry that he "cried himself to sleep at night". His only shoes were fashioned out of duct tape and cardboard;

(9) Clark was born with a cleft palate, which caused a severe speech impediment that resulted in constant teasing and harassment from family and friends;

(10) Clark experienced transition and mobility issues as a result of numerous changes in residential settings throughout his life.  His mother was repeatedly in prison and his maternal grandmother would often leave him and his brother at various family members' homes for long periods of time.  His grandmother was married to an alcoholic.  Clark lived with his mother's brother-in-law for a period of time and was often subjected to physical abuse.  More often than not, at an early age, Clark was left alone to care for himself;

(11) at age 7, Clark and his brother began experimenting with "huffing".  This would include gas, paint, and anything else they could find;

(12) at age nine and the beginning of the fifth grade, Clark, his brother, mother and her boyfriend, Holbert, moved in with his Aunt Verda and Uncle Nick.  Clark would experience some of his most devastating memories there.  Uncle Nick often physically abused him by burning him with cigarettes.  It was during this time that Clark found a puppy.  His mother had given him permission to keep the dog if he took care of it.  One day after school, Clark began playing with the puppy.  He had noticed that Holbert and his mother had been drinking, so he

knew to get the dog and "stay out of the way". Something made Holbert angry and he grabbed the puppy by his hind legs. Clark began to cry and Holbert slammed the puppy against the concrete several times until it died. Holbert then threw the dead puppy on Clark, stating that "crying is for sissies";

(13) Clark's mother and Holbert had a volatile relationship. The times they would present themselves in Clark's life, they were often on the run from the law and under the influence of drugs and alcohol. Holbert was a strict disciplinarian who would drink in excess, which often led to unpredictable violence primarily directed at Clark's mother but at times directed towards Clark and his brother. On one occasion, Holbert grabbed Clark's "little green chair" and struck his mother over the head causing blood to run down her face. This would be one of the many violent exchanges Clark and his brother would observe over the years;

(14) Clark did not complete school and left the educational system after the middle of the seventh grade. This lack of education would contribute to his inability to find a job and escape poverty without resort to criminal activity. He would however, obtain his GED while subsequently imprisoned;

(15) with his mother in prison, and fearful that Clark would be placed in foster care, she gave consent for him to marry. At age 15, Clark married and was on his own;

(16) at age 20, Clark's brother committed suicide by placing a shotgun in his mouth and pulling the trigger. Clark always felt responsibility for his brother's death as they had argued the night before his suicide;

(17) Clark's intoxication and addictive disease were the direct consequence of a devastating accumulation of risks that shaped his development and behavior. As a child, he had to contend with multiple risks: family mental illness, abandonment, family addictive and neurological disease, poverty, and life threatening danger at home and in the community. Each alone constituted a significant obstacle to healthy development, but in combination they resulted in serious emotional problems and mental impairments.

Ineffective assistance of counsel in capital cases has been a persistent problem in the United States. *See* James S. Liebman, *The Overproduction of Death*, 100 Colum. L.Rev. 2030, 2102-10(2000). In the most recent case on ineffective assistance, *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that counsel's investigation and presentation of mitigation "fell short of the standards for capital defense work articulated by the American Bar Association ... standards to which we have long referred to as 'guides to determining what is reasonable.'" In its discussion of the 1989 ABA Guidelines for

counsel in capital cases, the Court held that the Guidelines set

the applicable standards of performance of counsel:

> [I]nvestigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)....Despite these well defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Id*. at 2537 (emphasis in original). The Court then also adopted

ABA guideline 11.8.6, which it described as stating:

> that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences.

*Id*. (Emphasis in original.) Thus, the *Wiggins* case now stands

for the proposition that the ABA standards for counsel in death

penalty cases provide the guiding rules and standards to be used

in defining the "prevailing professional norms" in ineffective

assistance cases.

In its motion for summary judgment, Respondent argues that

Clark blocked his trial attorneys from interviewing his family

members for purposes of soliciting their testimony as mitigating

evidence during the punishment phase of trial, and thus, cannot

claim ineffective assistance of counsel. However, the record is

silent as to when Clark first gave his attorneys this directive

and what if any mitigation investigation had been done prior to Clark advising his attorneys not to conduct interviews of his family. Thus, and evidentiary hearing is necessary before this court can fully consider this issue. Moreover, Respondent's position ignores the ABA Guidelines and relevant case law on counsel's duty to investigate mitigation evidence in a capital case.

New ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. The 2003 ABA Guidelines do not depart in principle or concept from *Strickland*, *Wiggins* or previous cases concerning counsel's obligation to investigate mitigating circumstances. The 2003 ABA Guidelines at section 10.7 contain ten pages of discussion about counsel's "obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." The description of counsel's obligation to investigate mitigating evidence for the sentencing phase of the case is as follows (omitting quotation marks and the lengthy footnotes attached to the test):

> Counsel's duty to investigate and present mitigating evidence is now well established. *The duty to investigate exists regardless of the expressed desires of a client.* Nor may counsel sit idly by, thinking that investigation would be futile. *Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make*

*informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a through investigation with respect to both phases of the case. Because the sentencer in a capital case must consider mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.* In the case of the client, this begins with the moment of conception [i.e., undertaking representation of the capital defendant]. Counsel needs to explore:

(1)  Medical history;
(2)  Family and social history;
(3)  Educational history;
(4)  Military service;
(5)  Employment and training history;
(6)  Prior juvenile and adult correctional experience;

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of the first phase defense (*e.g.*, by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluation (including competency, mental retardation, or insanity), motion practice, and plea negotiations.
....
*It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The*

collection of corroborating information from multiple sources—a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7 (2003) at pp.80-83.

Clark recognizes that this court must measure counsel's performance against the prevailing standards at the time of his trial. Clark cites the 1989 and 2003 ABA Guidelines simply because they are the clearest exposition of counsel's duties that were recognized as applicable to the 1982 trial of the defendant in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995). Since the trial in *Glenn* took place even before the trial in the present case, the same standards regarding counsel's duty to investigate mitigating evidence, as articulated in the ABA Guidelines, are relevant here. Additionally, *Wiggins* involved a capital trial which occurred in 1989.

Here, the record is devoid of any evidence that counsel informed Clark about the importance of mitigation to the penalty phase or the consequences of limiting the penalty phase to attempts to rebut future dangerousness. In fact, the opposite is true. In his affidavit, Mr. Mims acknowledged that he himself failed to understand the role of mitigation in the penalty phase of a capital trial. ABA and judicial standards do

not permit a court to excuse counsel's failure to investigate or prepare because the defendant so requested. As stated previously, the Guidelines state that "the investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented," because

> [c]ounsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation....

ABA Guidelines § 10.7 (2003) at pp. 80-81. This guideline is supported by decisions in *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) and *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), as well as by a number of cases from other circuits, *see, e.g., Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) (counsel ineffective for "latching onto" client's assertions that he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow client to make an informed decision to waive mitigation); *United States v. Gray*, 878 F.2d 702 (3rd Cir. 1989) ("counsel can hardly be said to have made strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made"); *Knighton v. Maggio*, 740 F.2d 1344 (5th Cir. 1984) (petitioner entitled to relief if record

shows that "counsel could not make a valid strategic choice because he made no investigation"); *Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) (counsel's failure to investigate clearly affected his ability to competently advise defendant regarding the meaning of mitigation evidence and the availability of possible mitigation strategies); *Clayton v. Gibson*, 199 F.3d 1162 (10th Cir. 1999) (assuming, without deciding, that defense counsel "rendered deficient assistance by not contacting family members during the course of conducting a second stage investigation"); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) (concluding that reasonable investigation would have included interviews with defendant's sister and neighbor, as well as defendant's mother and brother); *Stafford v. Saffle*, 34 F.3d 1557 (10th Cir. 1994) (concluding that counsel's penalty-phase performance was deficient where counsel explored defendant's "background to some degree," but "conducted no specific investigation for mitigation evidence"); *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989) (concluding defense counsel's performance was deficient where "neither lawyer... investigated [the defendant's] background, leading to their total—and admitted—ignorance about the type of mitigation evidence available to them").

While it is true that Clark was a strong willed and challenging client who well may have restricted his trial

counsel's ability to raise the issue that he might be found guilty. The fact that Clark put up barriers to discussions of a penalty phase does nothing to relieve trial counsel of their constitutional duty as attorneys. *Strickland* permits attorneys to curtail or limit their investigations where "a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful," 466 U.S. at 691. "But where a client is [merely] recalcitrant, courts have been ambivalent in whether counsel is relieved of any further duty of investigation. *Marshall v. Hendricks*, 307 F.3d 36 (3rd Cir. 2002); *see also Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001) (finding that "defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate"); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) (counsel's failure to talk to potential mitigation witnesses and to investigate defendant's mental health status were unreasonable, because without knowing what evidence defendant was foregoing, counsel "could not have advised [him] fully as to the consequences of his choice not to put on any mitigation evidence," and therefore the waiver had no effect); *Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) (counsel failed to conduct a reasonable investigation for possible mitigating evidence and was therefore unaware of various mitigation strategies and evidence that could have been

presented in the penalty phase, and thus counsel could not competently advise defendant as to the meaning, nature, and availability of mitigating evidence; defendant's waiver was thus not knowing and intelligent); *Emerson v. Gramley*, 91 F.3d 898 (7th Cir. 1996).

This position is supported by the 1980 American Bar Association Standards in effect at the time of Clark's trial. While not directly addressing a situation where a client purportedly seeks to prohibit an attorney from investigating his background, these guidelines suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes. ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) reads as follows:

> Duty to investigate. It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Under existing case law, "the key to findings of ineffectiveness [is] not that mitigating evidence was not presented, but that counsel, as a result of inadequate preparation, had failed to discover the evidence." *Laws v.*

*Armontrout*, 863 F.2d 1377 (8th Cir. 1988). This is not a case, where, after reasonable investigation, Clark's trial counsel determined that it was tactically a better choice not to put on a mitigation case. Rather, it is a situation where trial counsel inadequately prepared for the penalty phase and put on no mitigating evidence because he had none to present. Therefore, counsel's decision was not a reasonable strategic choice, but an abdication of his constitutional duty. Nothing in the record provides a reasonable professional justification to support a decision not to present a case for life.

The cases cited by Respondent in its motion for summary judgment do nothing to detract from the principle that absent a reasonable investigation, counsel can not competently advise defendant as to the meaning, nature, and availability of mitigating evidence. In fact the cases cited by Respondent indicate that a waiver of mitigation must be intelligently and knowingly made. Absent reasonable investigation, no waiver can be found. The first case cited by Respondent is *Roberts v. Dretke*, 356 F.3d 632 (5th Cir. 2004), which involved a petitioner's request for a certificate of appealability on ineffective assistance claims. Before trial, Roberts advised his counsel of his desire to be convicted and sentenced to death. *Id*. at 634. In his request for a COA, Roberts argued that his counsel failed "to make adequate use of his court-

appointed psychiatrist. . . [by] conduct[ing] any in-depth investigation into Roberts' social and psychological background" .... *Id.* at 638. In granting Roberts' request for a COA, the 5th Circuit stated:

> Considering [counsel] presented no evidence of Roberts' life history, and there is evidence that he suffered from head injuries and mental disease, the reliability of the jury's determination as to Roberts' culpability is, at best, questionable, and thus a reasonable jurist could debate whether Roberts has demonstrated prejudice.
>
> For the foregoing reasons, we GRANT Roberts a COA on his claims that [counsel] rendered ineffective assistance of counsel by failing to properly develop evidence of Roberts' mental illness, and by failing to make adequate use of his court-appointed psychiatrist.

*Id.* at 641.

Likewise a review of the facts in *Autry v. McKaskle*, 727 F.2d 358 (5th Cir. 1984) reveals that prior to Autry's decision to forego mitigation, counsel "explained that he explored Autry's childhood and upbringing with Autry and Autry's mother—including Autry's relationship with his father—and looked to them as his testimonial sources." *Id.* at 361. Autry also admitted that shortly before his scheduled execution he drafted a letter to his trial attorney wherein he stated that: "You done what I asked of you on my second part of trial." *Id.* at 362. In holding that Autry had intelligently and knowing waived presentation of mitigation at sentencing, the court stated:

> While categorization of decisions as the personal
> choices of a criminal defendant or the tactical
> choices of counsel is not always an easy task,
> the United States District Court found that Autry
> made the decisions he now charges his lawyer
> incompetently made. *If Autry knowingly made the
> choices, Carver was ethically bound to follow
> Autry's wishes.* Significantly, that the decision
> was a knowingly one is supported by the testimony
> of Carver and by Autry's own letter written on
> the eve of his aborted execution.

*Id*. at 362-63.

Finally, Respondent also cites *Felde v. Blackburn*, 795 F.2d 400 (5th Cir. 1986). In *Felde*, the court noted that "[t]he record shows that Felde's attorney was familiar with his client's condition as the trial commenced." *Id*. at 402. In remanding to the district court, the 5th Circuit held that "[i]n light of our reasoning in *Autry*, we believe the district court was obligated to determine whether the state court finding that Felde was competent to stand trial and thus to waive his right to counsel is fairly supported by the record. Such a determination cannot be made on the basis of the present record".... *Id*. at 403. Thus, remand was necessary to determine if Felde's waiver was knowingly, intelligently and competently made.

Capital defendants, like Clark, have "a right -- indeed, a constitutionally protected right – to provide the jury with mitigating evidence ..." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). As the Supreme Court has held, "the sentencer [may] not

be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any aspect of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Mills v. Maryland*, 486 U.S. 367, 374 (1988). In the present case, the jury did not hear anything about Clark's history, character, or background. "It was not that such information could not be found, or that counsel made a reasoned decision to withhold the information for tactical or strategic reasons. The information was not presented to the jury because counsel never took the time to develop it." *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) (cited with approval in *Jermyn v. Horn*, 266 F.3d 257, 308 n. 25 (3rd Cir. 2001). Under the present circumstances, Clark has shown that his counsel was deficient.

Failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness. *See United States v. Gray*, 878 F.2d 702, 71-12 (3rd Cir. 1989) (holding that defendant's reluctance to subpoena witnesses to compel their attendance at trial did not absolve counsel of his independent professional responsibility to investigate whatever information these potential witnesses possessed, even if he later decided not to put them on the stand, and that "counsel's behavior was

therefore not colorably based on tactical considerations but merely upon a lack of diligence," so counsel's performance fell "below the minimum standard of reasonable professional representation"); *see also Sullivan v. Fairman,* 819 F.2d 1382, 1391-92 (7th Cir. 1987) (holding that perfunctory attempts to contact witnesses was not reasonable); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."); *Crisp v. Duckworth*, 743 F.2d 580,583 (7th Cir. 1984) ("though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation.").

Counsel's duty to *investigate* mitigating evidence is neither entirely removed nor substantially alleviated by his client's direction not to *call* particular witnesses to the stand. A lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made an "informed and knowing" judgment. *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993)(finding no deficient performance *where counsel was prepared to present mitigating*

*evidence* but precluded from doing so by the client's informed and knowing decision not to include it); *see also Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999). In the present case, Clark's reluctance to allow counsel to call witnesses during his punishment phase cannot be said to be an "informed and knowing decision" as trial counsel never conducted any independent investigation and thus could not competently advise Clark as to the meaning, nature, and availability of mitigating evidence.

The purpose of the penalty phase of a trial is to provide the jury with information that permits it to make an "individualized sentencing determination ... [based on] the character and records of the individual offender and the circumstances of the particular offense." *Penry v. Lynaugh*, 492 U.S. 302 (1989). The penalty phase exists to give counsel the opportunity to humanize his client, to show a jury that, despite its belief in his guilt, they should spare his life. "Mitigating evidence plays an overwhelmingly important role in the just imposition of the death penalty." *Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2002). "The presentation of mitigation evidence affords an opportunity to humanize and explain—to individualize a defendant outside the constraints of the normal rules of evidence." *Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000). "As a practical matter, the defendant probably has

little or no chance of avoiding the death sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." *Romano*, 239 F.3d at 1180. Here, the inescapable message sent to Clark's jury was that no one who really knew him—not parents, not family members, not friends—would take the stand to explain why his life was still worth saving.

Had competent counsel investigated and presented even a portion of the mitigation evidence concerning Clark's background, there is a reasonable likelihood that the jury would have returned a life sentence. If counsel had investigated Clark's case, he would have found a large body of mitigating evidence. Clark grew up in extreme poverty and neglect, surrounded by family violence and instability. Clark's mother was a drug addict who often resorted to prostitution and who would abandon her children, leaving them to fend for themselves. His father was very violent and beat Clark's mother regularly. Other "father figures" were either drug addicts and/or alcoholics who also beat his mother and subjected Clark to physical and emotional cruelty. Clark quit school in the 7th grade and permanently left home to fend for himself at age 15.

Had Clark's trial counsel tapped into the mitigating evidence available to him, he would have added flesh, bones, a

mind, and a heart to Clark.  The jury would have understood Clark's background, learned about the boy raised in poverty, and been forced to consider the young man who was a constant victim of physical and emotional abuse.  It would have has sympathy for his dependence on drugs and alcohol.  It could then have viewed his murder in context, perhaps even have construed it as driven by the psychological and social circumstances of his life.  Finally, it may have believed that his life, though shattered beyond repair, was still worth saving.  In hearing this evidence, the jury would have seen Clark more completely as it considered whether to sentence him to life or death.  While this evidence may not have swayed every juror, Clark need only show a reasonable probability that one juror would have found death an inappropriate punishment.

In case after case, federal courts have found prejudice when counsel fails to investigate, develop, or introduce mitigating evidence that is similar to the evidence in Clark's case.[1]  Here, such prejudice is bolstered by counsel's complete

---

[1]    *See Dobbs v. Turpin*, 142 F.3d 1383, 1389-91 (11th Cir. 1998) (counsel's complete failure to investigate and present mitigating evidence at the punishment phase was prejudicial where such evidence was available); *Smith v. Stewart*, 140 F.3d 1263 (9th Cir. 1998), *cert denied*, 525 U.S. 929 (1998) (counsel's complete failure to investigate and present any mitigating evidence at the punishment phase was prejudicial where such evidence was available); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998) (failure to present mitigation evidence was prejudicial where several

abandonment of Clark during closing argument of the penalty phase of trial which will be discussed below. Accordingly, Clark is entitled to a new punishment trial.

**2. Trial counsel's closing argument during punishment was constitutionally ineffective.**

In its motion for summary judgment, Respondent maintains that Clark's claim of constitutionally ineffective assistance of counsel during punishment-phase closing argument is "procedurally barred for failure to raise the issue on direct review...." In support of this position, Respondent cites *Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004) as finding that state procedural rule as firmly established and regularly followed as of April 2000. Contrary to Respondent's assertion, the opinion

relatives, friends, death penalty experts, and a minister were available to testify); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) *cert. denied* 522 U.S. 907 (1997) (holding defense counsel's performance ineffective and prejudicial at sentencing where he failed to make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); *Glenn v. Tate*, 71 U.S. 910 (1996) (defendant's lawyers inadequate preparation for sentencing phase was prejudicial where they did not acquaint themselves with defendant's social history, never spoke to any of his numerous brothers and sisters, never examined his medical records, or talked to his probation officer); *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (prejudicial impact where counsel failed to provide any assistance at a sentencing hearing); *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989), *cert. denied*, 493 U.S. 874 (1989) (substandard argument and the presentation of no evidence was prejudicial where fifteen character witnesses were available to testify at the sentencing hearing; and it amounted to no representation at all).

in *Busby* was not based on procedural default grounds.  In *Busby*,
the court stated the following:

> In order to determine whether Busby's claim is
> procedurally defaulted, we would have to decide
> (1) when precisely the state procedural rule
> became firmly entrenched and (2) when the rule
> was triggered.  In this case, we believe that
> Busby's First Amendment claim can be resolved
> more easily by looking past any procedural
> default.  Accordingly, we shall assume that the
> claim is not defaulted.

*Id*, at 720.

Moreover, in Texas, the state procedural rule requiring all
record based claims to be raised on direct appeal is not "firmly
established and regularly applied."  *See dissent Ex parte
Hernandez*, 2003 WL 1961484 (Tex. Crim. App. 2003).  Also, in
*Robinson v. State*, 16 S.W.3d 808 (Tex. Crim. App. 2000), the
Texas Court of Criminal Appeals held:

> The second reason we have given for not enforcing
> a procedural bar in this context is because there
> is not generally a realistic opportunity to
> adequately develop the record for appeal in post-
> trial motions.  In this regard, we have noted
> that a post-conviction writ proceeding, rather
> than a motion for new trial, is the preferred
> method for gathering the facts necessary to
> substantiate such a Sixth Amendment challenge...

*Id*. at 810.

In reaching its decision the Texas Court of Criminal
Appeals stated:

> The time requirements for filing and presenting a
> motion for new trial would have made it virtually
> impossible for appellate counsel to adequately

present an ineffective assistance claim to the trial court. *See* Tex.R.App.P. 21.4 (requiring motion for new trial to be filed no later than 30 days after trial court imposes sentence); Tex.R.App.P. 21.6 (requiring defendant to present motion for new trial to trial court within 10 days of filing it unless trial court, in its discretion, allows additional time.)

*Id*. at 811.

Finally, the Texas Court of Criminal Appeals stated:

In addition to the practical reasons expressed by this Court...for recognizing an exception to the rule of procedural default in the ineffective assistance context, we have also suggested that, as a fundamental constitutional right, such a Sixth Amendment challenge is not subject to the Requirements of Rule 33.1(a). In *Ex parte Gonzales*, this Court reinforced the well-established proposition that "the Sixth Amendment right to counsel is not forfeitable, but may only be waived by the conscious and intelligent decision of the person who holds the right." 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

*Id*. at 812.

Thus, when the Supreme Court speaks of a Sixth Amendment "right to counsel," it necessarily means the right to the "reasonably effective assistance" of counsel. For this reason, the standards for waiver should not be any less stringent in the context of an ineffective assistance claim than when we are speaking of a "right to counsel" claim. Functionally, they are synonymous.

There is no evidence in the record that appellant waived his right to the effective assistance of counsel. There was also no meaningful or realistic opportunity for appellant to present his ineffective assistance of counsel claim to the trial court either at trial or in a motion for new trial. For these reasons, the Court of Appeals erred in concluding that appellant

> forfeited his right to complain that his attorney
> rendered ineffective assistance of counsel by
> failing to comply with Rule 33.1(a).

*Id.* at 812-13.

Here, since the deficient closing argument was intertwined with trial counsel's failure to investigate and develop evidence for the punishment phase of Clark's trial, it cannot be said that direct appellate counsel had a "meaningful or realistic opportunity" to present his ineffective assistance of counsel claim to the trial court in a motion for new trial. Clark's appellate counsel would only have had forty days from imposition of sentence to discover and present all the evidence relating to trial counsel's failure to conduct any meaningful investigation of mitigation. Appellate counsel would not even have a transcript of the trial within this period of time. Moreover, the Supreme Court in *Massaro v. United States*, 538 U.S. 500 (2003), held that failure to raise an ineffective assistance of counsel claim on direct appeal does not bar the claim from being brought in a later post conviction writ proceeding. Accordingly, Clark's claim is not procedurally defaulted.

If any doubt remains that Clark's attorneys' were ineffective at the penalty phase, it is erased by counsel's closing argument. An argument which was interrupted by the trial judge who voiced concerns that trial counsel was "trying to create some kind of reversible error . . . by saying that you

[Clark's counsel] did not care. . . [by] keep [repeating] that you don't care what they [the jury] do basically." RR(58, 32). The relevant portions of the closing argument by Clark's counsel are as follows:

MR. NASH:   I guess about 9 p.m. yesterday evening after about my fifth beer, I asked Mr. Mims.   I'm scratching my head now wondering why I asked that.   I don't have a whole lot to say to you guys.   There's not a whole lot of good things I can say about Troy Clark either.   And perhaps at this stage, you're no too interested in what I've got to say.   I don't have a whole lot to say.   But I was wondering after that spectacle yesterday evening, where are we?   Was Troy Clark getting up on that witness stand the very last moments of the evening taunting you and manipulating you to give him a death sentence or did he actually give up?   I don't know – and at this point I don't really care, to tell you the truth.   Because I'm not sure it makes a whole hell of a lot of difference.   If anything I say to you, you don't agree with, that's fine.

We've been through a lot together the past two weeks.   I saw the evidence that came out.   I'm not going to fuss at your verdict.   It really didn't surprise me a whole lot with all that evidence with all of that what?   Two weeks of testimony.   That really didn't surprise me a whole lot.   I'm not going to fuss at you.

We spent what three days in punishment starting Monday. We didn't parade any character witnesses up here and tell you he's not such a bad guy. You know, we couldn't find a single relative that would say those kind of things. Where did that leave us? Where are we left? You know, in all irony, the only one who professed any type of regard for him was Tory Gene Bush. Some type of love I'll never fathom. Who probably single handedly will send him to death row but still loves him. Don't ask me to explain it. I haven't a clue. It's very possible you don't like Troy Clark after all you've seen, after all you've heard and, you know, I really don't care at this point, I really don't care. Because you know if that's your sentiment, I share it. To say that this has been a pleasure, to say, suggest that this has been an easy case to defend would be highly disingenuous. Troy Clark has probably been the most difficult client I've ever had to represent. In fact, he is the most difficult client I've ever had to present.

THE COURT: Let me ask the attorneys approach the bench, please. Now, you're testifying. Are you trying to create some kind of reversible error?

MR. NASH: No, Your Honor.

THE COURT: By saying you don't care? Is this a strategical move?

MR. NASH: No, Your Honor.

MR. CLARK:  Your Honor, can I fire him?

MR. NASH:  That's not where I'm going.

THE COURT:  You keep saying you don't care what they do basically.  I mean I don't understand the strategy here.  If you're trying to create some kind of reversible error by not giving him a fair argument on sentencing, I can't allow that to go on.

MR. NASH:  If you'll let me finish.

THE COURT:  All right.  See where you're going.

RR(58, 30-32)

. . .

MR. NASH:  You know, when Troy got up on the witness stand and if you think that's taunting or you think he gave up, either way it is for you to decide.  The thing is, you decide.  It's not Troy Clark's decision of whether or not he gets death or life.  It falls to you.  If you think he was trying to manipulate you, taunt you, dare you to sentence him to life, well, if that's the opinion you raised, you can call his bluff and find that the evidence will support the answers that would dictate a death sentence, then that's your judgment.

RR(58, 33-34)

As stated previously, Clark's counsel utterly failed to investigate mitigating evidence.  As a result, counsel did not introduce any mitigation during the punishment phase of trial.

Trial counsel then proceeded to make a closing argument to the jury that was not simply weak; it constituted an apology for having served as Clark's counsel. In his argument, trial counsel effectively distanced himself from his client and communicated to the jury that his presence was an obligatory part of the American system of justice. In effect, counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible crime. "[R]eminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused." *Goodwin v. Balkcom*, 684 F.2d 794, 806 (11th Cir. 1982). Rather than attempting to humanize Clark, counsel in his closing argument stressed the inhumanity of the crime.

Counsel's closing argument also failed to focus the sentencing jury's attention on "the character and record of the individualized offender and the circumstances of the particular offense…." *Penry*, 492 U.S. at 316 (citing *Woodson*, 428 U.S. at 304); *see also Armstrong*, 833 F.2d at 1433 ("[Petitioner's] trial counsel failed to provide the jury with the information needed to properly focus on the particularized characteristics of this petitioner."). Counsel never asked the jury to have mercy on Clark, to spare Clark's life or to sentence Clark to life imprisonment. Instead, he merely asked the jury to impose

a sentence with which they could live. This failure also demonstrates deficient performance. *See, e.g., Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert denied* 503 U.S 952 (1992) (holding that a sentencing argument that included "[m]aybe [the defendant] ought to die, but I don't know" to be inadequate). In the instant case, counsel's argument effectively relieved the jury of any doubt or anguish it might feel in sentencing Clark to death. Accordingly, counsel's argument resulted in the "breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696.

Counsel's punishment argument could have taken no more than 5 minutes to present. He cannot be said, under any standard, to have done a competent job in the brief time he spent. At times, counsel expressed empathy with the prosecution and resignation that he would not be able to persuade the jury in any event. At others, he made comments that do not appear relevant to any conceivable issue in the case. In the context of the rest of his sometimes disoriented argument, counsel seems to have been free-associating or saying whatever came into his mind at the moment. The argument smacks of lack of preparation and organization. Counsel was, as some like to put it, simply talking out loud or talking off the top of his head. In this

case he unfortunately failed to consider what effect that undisciplined exercise might have on the jury's deliberations.

Counsel's argument told the jury that it need not be concerned about the awesome function it was performing. Thus, counsel removed the chief obstacle to most jurors' willingness to vote for a death sentence --- individual conscience and the fear that an error in judgment may led to the wrongful taking of another person's life. As a result, counsel violated the most basic duty of a defense attorney in a capital case: to seek as zealously as possible within the bounds of the law to prevent the defendant from being executed. Moreover, the trial record itself reflects that counsel had no reasonable strategy for his closing argument. When his argument was interrupted by the trial judge, the following transpired:

THE COURT: **By saying you don't care? Is this a strategical move?**

MR. NASH: **No, Your Honor.**

Effective assistance also requires that an attorney adhere to his duty of undivided loyalty to his client. *Strickland*, 466 U.S. at 692. This duty includes acting as a meaningful adversary vis-a-vis the state.

> The right to counsel guaranteed by the Constitution
> contemplates the services of an attorney devoted
> solely to the interests of his client…. And nowhere is
> this service more honorable than in a case of
> appointment to represent an accused too poor to hire a

> lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is particularly abhorrent.

*Osborn v. Shillinger*, 861 F.2d 612, 624-25 (10th Cir. 1988) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 725-26 (1948)). Thus the duty of loyalty is violated not merely when counsel represents clients who have conflicting interests, but also when counsel acts more for the benefit of, and with more apparent sympathy toward, the prosecution than the client he is defending. *See id.* at 625 (quoting *Cronic*, 466 U.S. at 666) ("an attorney who adopts or acts on a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary.'")

Here, the most egregious errors and omissions by trial counsel cannot be explained solely by a failure to investigate Mr. Clark's case but rather point to counsel's failure to act as a diligent and loyal advocate for his client. "An effective attorney 'must play the role of an active advocate, rather than a mere friend of the court.'" *Osborn*, 861 F.2d at 624 (quoting *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *see also Cronic*, 466 U.S. 648, 656-57 ("if the process loses it character as a confrontation between adversaries, the constitutional guarantee is violated."). Indeed, as was stated in *Osborn*, the duty of loyal advocacy is more vital to effective assistance than the absence of third party conflicts of interest:

> [A]n attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because interests of the state and the defendant are necessarily in opposition.

*Id*. at 629. Accordingly, Clark is entitled to a new punishment trial.

## 3. The Cumulative Effect of the Failure to Investigate and Present Mitigating Evidence and Counsel's Deficient Closing Punishment Argument is in Itself a Violation of Clark's Constitutional Rights.

If trial counsel's failure to investigate and present mitigating evidence and trial counsel's deficient closing punishment argument do not independently result in a violation of Clark's constitutional rights, the cumulative effect of these deficiencies certainly deprived Clark of his constitutional rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The combination of trial counsel's deficient performance constructively denied Clark any defense at all in the penalty phase of trial. Clearly, Clark would have been prejudiced if the trial court had not permitted him to put on mitigating evidence at the penalty phase, no matter how overwhelming the State's showing of aggravating circumstances. "Actual or constructive denial of assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S.

at 692. "Prejudice in these circumstances is so likely that a case-by-case inquiry into prejudice is not worth the cost.

Counsel's lack of effort at the punishment phase of trial deprived Clark of the possibility of bringing out even a single mitigating factor. Mitigating evidence would have been admissible. The jury would have considered it and possibly been influenced by it. Accordingly, a reasonable probability exists that Clark's sentence would have been less severe had the jury balanced the aggravating and mitigating circumstances, particularly in light of the fact that the jury ultimately sentenced him to death. As a result, Clark has shown that he was substantially prejudiced by his trial counsel's complete failure during the punishment phase. *See, Milburn v. State*, 15 S.W.3d 267 (Tex. Crim. App. 2000); *Ex parte Felton*, 815 S.W.2d 733, 737 n. 4 (Tex. Crim. App. 1991).

**4. Trial Counsel was Ineffective During the Guilt/Innocence Portion of Trial for "Opening the Door" and Allowing Extraneous Evidence of Another Murder Alleged to Have Been Committed By Clark.**

**5. Introduction of Extraneous Evidence of Another Murder Alleged to Have Been Committed By Clark During the Guilt/Innocence Stage of His Trial Resulted in a Deprivation of Due Process.**

Respondent maintains that these claims are procedurally defaulted because he did not raise the instant constitutional claims on direct appeal. As discussed above in Clark's claim of

ineffective closing argument by trial counsel, these claims are not procedurally defaulted.


## BACKGROUND

Clark had originally been indicted for two different offenses, the instant case involving the death of Christina Muse and another case involving the death of one Tracy Mize Socia. Prior to trial, defense counsel filed a Motion in Limine seeking to preclude the State from introducing evidence regarding the Mize murder case. This motion was granted by the trial court. RR(33,28) Thereafter, while Tory Bush was testifying during the guilt/innocence portion of Clark's trial, the following occurred:

Prosecution: What letters did he want you to write about the Christina Muse situation?

Ms. Bush: He wanted me to change the whole story. He wanted me to lay the blame on two other people, and those two other people are dead.

Prosecution: … without going into who the other two people are, he wanted you to take the blame completely away from him and you?

Ms. Bush: Yes. Well, it wouldn't have took it completely away from me.

RR(41, 101)

Clark's counsel then cross-examined Ms. Bush concerning the various versions of events she had previous given to law enforcement officials.

Defense:      All right.   And on that date, who did you say was involved in that killing.

Ms. Bush:      I think I said Tracy Mize was.

Defense:      Tracy Mize.   Tell us exactly what you told him.

Ms. Bush:      I can't tell you.   I lied.

RR(41, 141)

Clark's counsel then went on to establish that Tracy Mize had helped dispose of Muse's body and that Ms. Bush had entered into an agreement wherein she would cooperate and assist in the prosecution of Tracy Mize.   In exchange for her cooperation, Ms. Bush would be sentenced to thirty years. RR(41, 142) Clark's counsel then established through Ms. Bush that while they were searching for the body of Christina Muse they found Tracy Mize's body instead. RR (41,142) This was the first mention of Mr. Mize's death and it was brought about by Clark's own counsel. In essence, Clark's counsel violated its own motion in limine.

The State then argued that the door had been fully opened to show Clark's alleged involvement in the death of Tracy Mize. RR (41,148)   The trial court allowed Ms. Bush to testify regarding her purported knowledge of the facts of Mize murder,

holding that the relevance of the testimony went to her credibility.  RR (41,159)

Tory Bush was then allowed to testify regarding the murder of Mr. Mize and Clark's purported involvement in his death.  She testified that immediately before his murder, Mr. Mize and Clark traveled to Houston.  That shortly after returning, she and Clark went out to a trailer located on Ms. Young's property.  That when Clark opened the door to the trailer, Mr. Mize was sitting inside with his hands cuffed together. RR(42, 27-29) The State then called additional witnesses who testified that the body of Tracy Mize was found in a septic tank in close proximity to where Ms. Muse's body was ultimately found.  The State also called a DPS firearms examiner to testify that the bullets recovered from the body of Tracy Mize were consistent with those fired from Clark's gun.

DISCUSSION

Had Clark's counsel not opened the door to admission of this extraneous offense, it is clear that evidence surrounding the death of Mr. Mize would not have been admissible during the guilt/innocence portion of trial.  It has long been held that evidence of other crimes or bad acts are not admissible to show the accused acted in conformity with that evidence in committing the crime for which he is charged. *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990)

It is equally clear that there could be no conceivable valid strategic trial strategy for defense counsel to open the door to this evidence. If trial counsel's strategy was to impeach Ms. Bush by showing that she had previously lied in her statements to law enforcement officials, that objective was reached when she responded to a question by the State during direct examination that she had previously given a statement and that the statement was untrue. RR (41,141) Thus, trial counsels' performance was deficient when they opened the door to introduction of evidence concerning the murder of Tracy Mize.

There can be no doubt that Clark was prejudiced by introduction of this extraneous evidence. This was not a case with overwhelming evidence of Clark's guilt. There was no physical evidence clearly linking Clark with the commission of the offense. There were no fingerprints, no DNA evidence and no testimony conclusively establishing that the duct tape used to restrain Ms. Muse and the concrete found covering her body were the same that had been in Clark's possession. Accordingly, Clark's writ should be granted.

**6. Trial Counsel was Ineffective During the Guilt/Innocence Portion of Clark's Trial for Allowing Extraneous Evidence of the Kidnapping/Assault of Wesley Crocker to be Admitted.**

**7. Introduction of Extraneous Evidence of the Kidnapping/Assault of Wesley Crocker During the Guilt/Innocence Stage of Clark's Trial Resulted in a Deprivation of Due Process.**

BACKGROUND

During the guilt/innocence portion of trial, Amber Scroggins testified that she had seen a stun gun at Clark's residence. Without an objection by the defense attorneys, Ms. Scroggins was also allowed to testify that Clark had bragged about using the stun gun on Wesley Crocker. RR(35, 29) As a direct result of trial counsels' omission, Wesley Crocker was allowed to testify regarding an extraneous incident involving Clark.

Mr. Crocker testified that he owed Clark money for drugs. When he did not timely pay his debt, Clark arranged for two other individuals to abduct him and bring him to a shop owned by Clark's cousin. When Mr. Crocker arrived at the shop, Clark hit him with a tire iron and shocked him repeatedly with a stun gun. RR (36, 85-92)

Clark then took Mr. Crocker home and continued the assault by hitting Mr. Crocker with a wire brush and using the stun gun again. During the period of the second assault, Clark made the statement "it's tough not knowing whether your going to live or die". RR (36, 93-97) Ultimately, Clark released Mr. Crocker with the understanding that he would work off his debt by assisting in the remodeling of Clark's home. RR (36, 101)

DISCUSSION

Trial counsels' failure to object to Ms. Scroggins testimony that she had previously heard Clark brag about using

the stun gun on Mr. Crocker led directly to the admission of testimony concerning this extraneous offense from Mr. Crocker himself.  Trial counsel was clearly deficient in this regard.

Admission of this testimony not only established Clark had a propensity for violence, it also established a pattern of use of the stun gun by Clark.  This fact is critically important considering that a stun gun was used during the murder of Ms. Muse.  Thus, there can be no doubt that Clark's defense suffered prejudice as a result of trial counsel's deficient performance. As stated previously, this was not a case with overwhelming evidence of Clark's guilt.  There was no physical evidence clearly linking Clark with the commission of the offense. Accordingly, Clark's writ should be granted.

**8. Trial Counsel was Ineffective for Failing to Object and Request an Immediate Curative Instruction Relating to the Trial Judge's Improper Comment on Clark's Credibility.**

**9. Clark was Denied His Due Process Right to a Fair Trial When the Trial Judge Made an Improper Comment on Clark's Credibility.**

BACKGROUND

During the guilt/innocence portion of trial, Clark elected to testify on his own behalf.  On cross-examination, while the prosecution was inquiring about Clark's whereabouts after Ms. Muse's disappearance, the following transpired:

Prosecution:  Did you ever see her again after you drove out of the driveway?

Mr. Clark:     No, sir.

Prosecutor:     How long were you gone over to Blue's?

Mr. Clark:     I couldn't tell you no time.  I mean, estimate three to four hours.  I wasn't just at Blue's.  You know, I had stopped by a few other friends' house.

Prosecutor:     Delivering drugs?

Mr. Clark:     Yeah.

Prosecutor:     Whose house did you stop at?  You're looking up there?

Mr. Clark:     I don't want to get nobody in trouble, but I guess I've got to tell the truth.

The Court:     Yeah.  You're supposed to.

RR (47, 126-27)

At this point the jurors, counsel and other spectators burst into laughter.  Clark's counsel not only failed to object to the trial judge's comment, they also failed to request an immediate curative instruction.

DISCUSSION

The rule in Texas governing discussion of evidence by the trial court is as follows:

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict,

> make any remark calculated to convey to the jury
> his opinion of the case.

Tex.Code Crim.Proc. Ann. Art. 38.05. In enacting this provision, the Legislature recognized the fact that the position of the trial judge carries great influence and that his opinion is naturally received by juries with deference. In order to guard against an invasion by the judge of the province of the jury in determining the credibility of the witnesses and the weight to be given to their testimony, the statute was enacted.

Thus, it has long been a well established rule in the State of Texas that a trial judge should studiously avoid making any remark calculated to convey to the jury his opinion of the case or of any fact issue raised by the evidence. *McClory v. State*, 510 S.W.2d 932, 934 (Tex. Crim. App. 1974). This rule is true because jurors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved. *Jones v. State*, 788 S.W.2d 834, 836 (Tex. App. – Dallas 1990, no pet.).

Reasonably professionally competent counsel would have been familiar with this rule and the effects such a comment would have on the jury in determining the credibility of an accused. Thus, trial counsel's failure to object to the judge's comment was deficient performance. Moreover, it cannot be argued that

the court's charge cured the error. "[T]o be effective, an instruction to disregard must immediately follow the comment and not await the reading of the charge. . . because a trial judge's improper comment on the weight of the evidence, not at once ordered to be disregarded by the judge's command, festers in the jury's mind so as to increasingly benefit the State as the trial progresses and so as to increasingly prejudice the defendant as the trial progresses. *Bachus v. State*, 803 S.w.2d 402, 406-7 (Tex. App. – Dallas 1991). Indeed, although federal trial judges have the right to comment on the evidence, there are limitations. *See United States v. Dillon*, 446 F.2d 598, 601 (5th Cir. 1971) Where the federal trial court exceeds those limitations in its charge, the prejudicial effect of the charge cannot be cured by the court further instructing the jury in the charge that assessment of credibility of the witness was their exclusive function. *See Dillon*, 446 F.2d at 601.[2]

---

[2]     The seminal case stating this principle is *Quercia v. United States*, 289 U.S. 466, 469 (1933), in which the Supreme Court held: "It is within [the judge's] province . . . to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence. . . ." The Court reversed the defendant's conviction because the trial judge's observation that a witness wiping his hands while testifying was almost always an indication of lying was "a sweeping denunciation repudiat[ing] as a lie all that the accused had said in his own behalf. . . . This was error and we cannot doubt that it was highly prejudicial." *Id.* at 472. The Court added:
> Nor do we think the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury and that if they did not agree with it they should find the defendant not guilty. His definite and concrete assertion of fact . . .was not withdrawn. His characterization of the manner and testimony of the accused

**10. The Cumulative Effect of the Violations is in Itself a Violation of Clark's Constitutional Rights.**

The cumulative effect of state and federal constitutional and statutory infirmities in the trial of Clark's case as set forth above is itself a violation of Clark's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Clark prays that this Court:

1.   Grant him a full and fair evidentiary hearing on all claims raised by his Petition;

2.   At the conclusion of the evidentiary hearing, enter an Order denying Respondent's Motion for Summary Judgment;

3.   Grant his Petition and enter an Order entitling him to a new trial; and

4.   Grant Clark such other and further relief as may be just and proper.

Respectfully submitted,

**CRAIG L. HENRY**
Attorney at Law
723 Main Street
P.O. Box 3226
Texarkana, Texas 75504
(903) 792-4645
Fax (903) 792-5073

---

was a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence. *Id.*

By /s/ Craig L. Henry
CRAIG L. HENRY
Arkansas Bar # 90142
Oklahoma Bar # 016779
Texas Bar # 09479260
Attorney for Petitioner

## Certificate of Service

I certify that the foregoing pleading was served upon the Office of the Attorney General of the State of Texas, Postconviction Litigation Division, by delivering a copy to Deni S. Garcia, Assistant Attorney General, P.O. Box 12548 Capitol Station, Austin, Texas 78711, this 15th day of November, 2004.

/s/ Craig L. Henry
Craig L. Henry
Counsel for Petitioner