IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

TROY CLARK,                          §
        Petitioner
                               §

vs.                                                        No. 2:03cv357

                               §

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,     §
Correctional Institutions Divisions,
        Respondent        §


MEMORANDUM OPINION


Petitioner Troy Clark ("Clark"), an inmate confined to the Texas Department of Criminal

Justice, Correctional Institutions Divisions, filed a petition for writ of *habeas corpus* pursuant to

28 U.S.C. § 2254.  Clark challenges his capital murder conviction and death sentence imposed on

March 23 and 30, 2000, in the 7th Judicial District Court of Smith County, Texas, in cause

number 007-81708-98, styled *The State of Texas v. Troy Clark*.

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA")

because Clark's petition for federal *habeas corpus* relief was filed on March 2, 2004, after the

AEDPA effective date of April 24, 1996.

The facts of this case, as taken from the Texas Court of Criminal Appeals, are as follows:

[Petitioner] lived with Tory Bush in Tyler, Texas, where the two used and sold
methamphetamine.  The victim, Christina Muse, lived with them for a short period of
time.  When Muse moved out, [Petitioner] became concerned that she would talk to the
wrong people and "snitch" on him about his drug dealings.

According to Bush, Muse came by [Petitioner's] house on May 19, 1998, and talked with
Bush in the front bedroom.  At some point during their conversation, [Petitioner] stunned

Muse with a stun gun to her neck and told her she "should have kept [her] mouth shut." When Muse fell to the floor, [Petitioner] bound her hands, legs, and mouth with duct tape. [Petitioner] then placed Muse in a closet in the second bedroom, and Bush could hear [Petitioner] talking to her.  After "a couple of hours," [Petitioner] moved Muse into the bathroom and told Bush to get him a board.  Bush complied and returned to the kitchen, shortly after which she heard the loud "whack" of a board striking something. [Petitioner] yelled for Bush to come to the bathroom where she found Muse in the bathtub, blood on the back wall of the tub, and [Petitioner] filling the tub with water. [Petitioner] told Bush to help him hold Muse's head under water and threatened her when she hesitated.

After drowning Muse, [Petitioner] told Bush to go buy some lime.  Bush then went across the street to Amber Scoggin's [sic] house to get a ride to the store.  When Bush returned, she took the lime to [Petitioner] in the back storage room of the house where she saw Muse's body in a blue barrel filled with cement mix. [Petitioner] poured the lime into the barrel, mixed in water, and put a lid on the barrel.  The next morning, [Petitioner] woke Bush and instructed her to clean up the backyard and to put some debris and garbage in the barrel over Muse's body.  When Ben Barnett, Mike Coats, and Amber Scoggins arrived later, [Petitioner] and the two men loaded the blue barrel in the back of [Petitioner's truck].  After the others left, [Petitioner] and Bush transported the barrel and other trash to the property of their landlord, Velva Young.  Bush told the jury that the last time she saw the barrel it was in [Petitioner's] truck, which was parked by the trash pile on Young's property.  Bush then went to Young's house, while [Petitioner] borrowed Young's tractor and returned to the trash pile by himself for about an hour.[1]

On March 23, 2000, a jury found Petitioner guilty of the May 19, 1998 capital murder of

Christina Muse.  Based upon the jury's answers to the special issues, the trial court sentenced

Petitioner to death.  The Texas Court of Criminal Appeals affirmed Petitioner's conviction and

death sentence on direct appeal.  *Clark v. Texas*, No. 73,816 (Tex.Crim.App. Nov. 25, 2002).

While Petitioner did not file a petition for writ of *certiorari* with the United States Supreme

Court, he did file a state application for post-conviction relief.  The Texas Court of Criminal

Appeals adopted the trial court's findings of facts and conclusions of law and denied *habeas*

relief.  *Ex parte Clark*, No. 55,996 (Tex.Crim.App. Oct. 1, 2003).  Petitioner then filed his

---

[1] These facts are taken from the Texas Court of Criminal Appeals decision on direct appeal.  *Clark v. Texas*, 73,816 (Tex. Crim. App. Nov. 25, 2002).

petition for writ of *habeas corpus* in this Court on March 2, 2004.

28 U.S.C. § 2254(d) provides that relief in *habeas corpus* cases may not be granted with respect to any claim which was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  Pure questions of law and mixed questions of law and fact are reviewed under § 2254 (d)(1), while pure questions of fact are reviewed under §2254 (d)(2).  Factual findings made by the State court are accepted unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

In his first claim, Petitioner argues that defense counsel failed to investigate or present evidence which would have mitigated against the imposition of the death penalty.  Specifically, Petitioner claims that counsel failed to investigate Petitioner's family background or his social, medical, and mental history.  In support of his claim, Petitioner has attached to his application records from the defense team which he contends reflect minimal investigation into mitigating evidence, as well as an affidavit from his mother which states that had she been contacted by Petitioner's defense team she would have discussed with them Petitioner's dysfunctional childhood marked by physical abuse, poverty, and abandonment.  Additionally, Petitioner has provided the Court with a social history report prepared by a mitigation investigator detailing this evidence which was gathered from numerous records, as well as interviews with family members.  The Texas Court of Criminal Appeals, adopting the trial court's findings of fact and conclusions of law, found that Petitioner failed to show that his trial counsel were ineffective for

failing to interview Petitioner's mother.  The inquiry for this Court is whether the state court's

decision was contrary to, or involved an unreasonable application of, clearly established federal

law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

To establish ineffective assistance of counsel, a criminal defendant must show that his

attorney's assistance was deficient and that the deficiency prejudiced him.  *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  To establish deficient performance, a petitioner must

demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id*.

at 688.  To show prejudice, the defendant must show a reasonable probability that, absent his

attorney's error, the jury would have concluded that the balance of aggravating and mitigating

circumstances did not warrant the death sentence.  *Id*. at 695.  In *Wiggins v. Smith*, 539 U.S. 510,

522 (2003), the Supreme Court explained that the focus in an ineffective assistance claim based

on the failure to investigate and present mitigating evidence is not on whether counsel should

have presented a mitigation case, but rather on whether the investigation supporting counsel's

decision not to introduce mitigating evidence was itself reasonable.

Petitioner asserts that the standard practice in Texas capital cases at the time of his trial

included the preparation of a social history report.  Although the state made funds available to

prepare a report, counsel made no attempt to retain a forensic social worker to do so.  Petitioner's

lead trial counsel prepared an affidavit admitting that he and co-counsel "most likely rendered

ineffective assistance of counsel" during the punishment phase.  Counsel states that he did not

attempt to obtain records relating to Petitioner's past or background, nor did he conduct any

interviews with Petitioner's family members, neighbors, teachers, employers, or co-workers in an

attempt to discover potentially mitigating evidence.  Lead counsel claims that his failure to obtain

this information resulted from a lack of training on mitigation practice as well as the
"embryonic" state of this area of law at the time of Petitioner's trial.

The "obligation to investigate, in the context of a capital sentencing proceeding, requires
defense counsel to undertake a reasonably thorough pretrial inquiry into the defenses which
might possibly be offered in mitigation of punishment . . . ." *Baldwin v. Maggio*, 704 F.2d 1325,
1332 (5th Cir. 1983).  The American Bar Association's (ABA) Guidelines for the Appointment
and Performance of Counsel in Death Penalty Cases have long been "referred as 'guides to
determining what is reasonable.'" *Wiggins*, 539 U.S. at 524.  Of particular significance to the
instant case is ABA guideline 11.8.6 which states that counsel should consider presenting
information on medical history, educational history, and *family and social history*. *Id*. (emphasis
in original).  As early as 1989, ABA guidelines advised counsel to investigate the very type of
mitigating evidence Petitioner's defense counsel admittedly failed to consider.  This persuades
the Court that Petitioner's counsel fell far short of professional norms when they failed to
investigate his background.  Counsel's affidavit indicates that there was no strategy behind the
decision to forego an investigation of or to present evidence of Petitioner's childhood.  Defense
counsels' conduct was clearly unreasonable.

The Director argues that Petitioner blocked counsel from interviewing his parents, and
therefore, cannot claim ineffective assistance of counsel for failing to present evidence which his
parents would have provided.  However, the fact that Petitioner insisted that his parents not be
called to testify at the punishment phase does not excuse counsels' duty to investigate possible
mitigating evidence.  The ABA guidelines specifically state that "[t]he duty to investigate

5

[mitigating evidence] exists regardless of the expressed desires of a client."[2]  Petitioner's mother's affidavit shows that she would have provided information which should have prompted the defense team to investigate potentially valuable mitigation evidence in the form of school and medical records, as well as interviews with family members other than Petitioner's parents.  Even without Petitioner's mother's affidavit as a resource, counsel should have considered a host of sources for possible mitigating evidence.

This is not a case where counsel, after conducting a reasonable investigation, made the strategic decision not to put on evidence of Petitioner's family and social history.  The record demonstrates that counsel conducted virtually no investigation into potentially mitigating evidence.  Lead defense counsel's own admission of his failure to even consider crucial mitigating evidence, as well as the defense investigator's report which is silent as to any investigation of Petitioner's family background or social history, shows a complete failure to fulfill counsels' duty under *Wiggins* and *Strickland*.

To be entitled to relief on a claim of ineffective assistance of counsel, however, it is not enough that counsel's performance in a case was deficient.  A reviewing court must be convinced that there is a reasonable probability that but for counsel's deficient performance "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The Texas Court of Criminal Appeals found that Petitioner's mother's affidavit did not provide any information that would have made a difference in the way the jurors answered the special issues at punishment.

---

[2]  While this guideline was adopted in 2003, it simply explains in greater detail the 1989 guidelines stating the obligations of counsel to investigate mitigating evidence.

In determining prejudice in this context, the Court must look at the evidence actually presented at sentencing and compare it with the mitigating evidence submitted in support of Petitioner's claim to determine whether the result would have been different.  Because Texas law requires the jury to vote unanimously to impose the death penalty, the result would have been different if "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Petitioner's] reduced moral culpability, death was not an appropriate sentence[.]"  *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003).  Petitioner argues that his mother's affidavit detailing Petitioner's childhood marked by physical and emotional abuse presents a hugely sympathetic case for mitigation.  Petitioner also relies upon a report, submitted for the first time with his response to the Director's motion for summary judgment, compiled by a mitigation expert which chronicles Petitioner's upbringing and family life. Petitioner points to his mother's drug use, supported by prostitution, her incarceration throughout Petitioner's childhood, Petitioner's father's absence from his life, and a surrogate father who was an alcoholic and another who physically abused Petitioner as evidence which would have persuaded the jury to return a verdict in support of a life sentence.

The Director argues that Petitioner has presented only unsupported allegations about his childhood, and that this is insufficient to challenge the outcome of Petitioner's trial.  Assuming *arguendo* the truth of the facts contained in Petitioner's mother's affidavit, and those found in the expert's report, there are several reasons the Court concludes that it is not reasonably likely that had the circumstances of Petitioner's childhood been presented to the jury, the result of the case would have been different.

First, while Petitioner had a childhood that was far from ideal, the Court believes that there is not a reasonable probability that the evidence he claims should have been introduced would have persuaded the jury to answer the special issues in such a way that Petitioner would have received a life sentence rather than the death penalty.  *See id*. at 243 (prejudice determination requires court to assign significant weight to the quality of additional mitigating evidence).  The quality of Petitioner's additional mitigating evidence is arguably less significant than evidence presented in cases where courts have found prejudice.  *See Wiggins,* 539 U.S. at 517 (evidence of physical torment, sexual molestation, repeated rape in foster care, and long term abandonment by alcoholic mother during which time the petitioner and his siblings forced to beg for food and eat paint chips and garbage and "apparent absence of any aggravating factors"); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (petitioner's parents imprisoned for criminal neglect of petitioner, petitioner severely and repeatedly beaten, placement in abusive foster home; further, petitioner turned himself in and confessed to crime);  *Lewis v. Dretke*, 355 F.3d 364, 368-69 (5th Cir. 2003) (record replete with testimony from the petitioner's family members of severe abuse occurring over several years and requiring numerous trips to the hospital).

Furthermore, the evidence Petitioner offers is "double-edged," both mitigating and aggravating.  Petitioner urges that the evidence of inadequate supervision, unstable living environment, and abuse make him less morally culpable for his behavior.  The evidence also suggests, however, that Petitioner was a product of a terribly flawed upbringing who failed to learn how to function within the boundaries set by society.  In *Martinez v. Quarterman*, 481 F.3d 249, 258 (5th Cir. 2007), the Fifth Circuit addressed a similar situation and recognized that

evidence of the petitioner's temporal lobe epilepsy (TLE) was double-edged in that the "jury could have felt that TLE made [the petitioner] a future danger because it inclined him toward uncontrolled aggression, or the jury could have accepted TLE as evidence that [the petitioner] acted with diminished capacity."

Additionally, it is significant to the Court's analysis that the jury had before it overwhelming evidence of Petitioner's future dangerousness.  In its findings, the state court emphasized that the jury learned that Petitioner assaulted, bound, kidnapped, beat, and drowned the victim in this case before he dumped her body in a barrel, poured lime over it and covered the body with cement and took it to be buried in a remote location.  In addition to the instant crime, the jury heard evidence that Petitioner murdered two other people, committed several aggravated assaults and thefts, and dealt drugs over a long period of time.  It is extremely difficult to establish prejudice resulting from counsel's failure to introduce mitigating evidence when evidence of this nature is presented.  *See Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).  In *Ladd*, the Fifth Circuit found that the state court "was well-within the bounds of AEDPA reasonableness in ruling that [the petitioner] had suffered no prejudice" by his counsels' failure to introduce evidence of the petitioner's troubled childhood and lack of supervision.  The Circuit Court emphasized the evidence of the petitioner's future dangerousness, including not only the facts of the capital murder at issue, but of a similar crime committed by the petitioner over a decade earlier.

Finally, the jury was able to assess Petitioner first hand by way of his testimony at the punishment phase.  Against counsel's advice, Petitioner testified before the jury, often assuming a taunting, argumentative, and sarcastic demeanor.  Petitioner sparred with the prosecutor, stating

that he wanted the death penalty rather than spending the rest of his life locked up for something he "didn't do."  Although the jury had already found Petitioner guilty of capital murder, Petitioner refused to accept responsibility for the crime and showed no remorse.  The jury gained insight into Petitioner's character, as an individual who had just been found guilty of capital murder and was facing a death sentence, through this exchange which likely influenced the way it answered the special issues.

Given Petitioner's violent history, and his failure to accept responsibility or show remorse, it was not unreasonable for the state court to conclude that the outcome of the trial would have been the same because evidence of Petitioner's abusive and troubled childhood would not have reduced Petitioner's moral culpability for a crime such as the one committed in the instant case.  Therefore, the Court concludes that the state court's decision that Petitioner was not prejudiced by his trial counsels' failure to introduce mitigating evidence was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Strickland*.  28 U.S.C. § 2254(d)(1).  The Court will grant the Director's motion for summary judgment on Petitioner's first claim.

In his second claim, Petitioner contends that his counsel's punishment phase closing argument amounted to ineffective assistance.  The state *habeas* court found that because Petitioner did not raise this claim on direct appeal, the issue was waived.  The Director argues that the finding by the state court bars this Court's consideration of the claim, citing the rule that a federal *habeas* court should not consider issues of federal law when a state court judgment plainly rests on an independent and adequate state law ground.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The procedural default, in this case the state court's finding of waiver, is

not an adequate ground for denial of relief unless the state court applies the bar "strictly or

regularly ... to the vast majority of similar claims." *Amos v. Scott*, 61 F.3d 333, 339 (5th Cir.),

*cert. denied*, 516 U.S. 1005 (1995).  The Texas Court of Criminal Appeals has addressed cases in

which ineffective assistance claims were raised for the first time on *habeas* review, and has

consistently stated that such is the preferred method for reviewing those claims.  *See Freeman v.*

*Texas*, 125 S.W.3d 505, 506 (Tex.Crim.App. 2004) (recognizing court has held several times that

record on appeal cannot adequately reflect failings of trial counsel);  *Thompson v. Texas*, 9

S.W.3d 808, 813-14 (Tex.Crim.App. 1999) (noting risk of bringing ineffective assistance claims

on direct appeal due to undeveloped record).  Because Texas does not strictly or regularly reject

ineffective assistance claims raised for the first time on *habeas* review, the rule cited by the state

court cannot be considered an adequate state procedural ground barring this Court from reaching

the merits of Petitioner's claim.

     The portions of counsel's closing argument which Petitioner specifically objects to are as

follows:

> Counsel:     I guess about 9 p.m. yesterday evening after about my fifth beer, I asked
> Mr. Mims.  I'm scratching my head now wondering why I asked that.  I
> don't have a whole lot to say to you guys.  There's not a whole lot of good
> things I can say about Troy Clark either.  And perhaps at this stage, you're
> really not too interested in what I've got to say.  I don't have a whole lot to
> say.  But I was wondering after that spectacle yesterday evening, where are
> we?  Was Troy Clark getting up on that witness stand the very last
> moments of the evening taunting you and manipulating you to go give him
> a death sentence or did he actually give up?  I don't know – and at this
> point I don't really care, to tell you the truth.  Because I'm not sure it
> makes a whole hell of a lot of difference.  If anything I say to you, you
> don't agree with, that's fine.
>
> We've been through a lot together the past two weeks.  I saw the evidence
> that came out.  I'm not going to fuss at your verdict.  It really didn't

surprise me a whole lot with all that evidence with all of that what?  Two weeks of testimony.  That really didn't surprise me a whole lot.  I'm not going to fuss at you.

We spent what three days in punishment starting Monday.  We didn't parade any character witnesses up here to come up here and tell you he's not such a bad guy.  You know, we couldn't find a single relative that would say those kind of things.  Where did that leave us?  Where are we left?  You know, in all irony, the only one who professed any type of regard for him was Tory Gene Bush.  Some type of love I'll never fathom.  Who probably single handedly will send him to death row but still loves him.  Don't ask me to explain it.  I haven't a clue.  It's very possible you don't like Troy Clark after all you've seen, after all you've heard and, you know, I really don't care at this point.  I really don't care.  Because you know if that's your sentiment, I share it.  To say that this has been a pleasure, to say, suggest that this has been an easy case to defend would be highly disingenuous.  Troy Clark has probably been the most difficult client I've ever had to represent.  In fact, he is the most difficult client I've ever had to present.

*             *             *             *             *

You know, when Troy got up on the witness stand and if you think that's taunting or you think he gave up, either way it is for you to decide.  The thing is, you decide.  It's not Troy Clark's decision of whether or not he gets death or life.  It falls to you.  If you think he was trying to manipulate you, taunt you, dare you to sentence him to life, well, if that's the opinion you raised, you can call his bluff and you find that the evidence will support the answers that would dictate a death sentence, then that's your judgment.

In rejecting Petitioner's claim, the state *habeas* court found that there was a "legitimate trial strategy employed during the closing argument to redirect the attention of the jury from Petitioner's challenge to execute him to their duty to evaluate the evidence when answering the special issues."  The state court also found that Petitioner "failed to establish a reasonable alternative course of action" that counsel could have employed which would have resulted in a different verdict at punishment.  Finally, the state court concluded that Petitioner failed to show

12

that counsel's closing argument was "actually injurious" to Petitioner.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

Petitioner complains that counsel failed to act as a diligent and loyal advocate, distanced himself from Petitioner, and in effect, apologized for having served as Petitioner's counsel.  Additionally, Petitioner argues that counsel failed to focus the jury's attention on Petitioner's character and the circumstances of this particular crime, and never asked the jury to have mercy on Petitioner.  Counsel's argument, Petitioner claims, relieved the jury of any doubt or anguish it might feel in sentencing Petitioner to death.

The trial court held a hearing on Petitioner's motion for new trial, which challenged trial counsel's argument at the punishment phase.  At the hearing, counsel explained that Petitioner testified during punishment, against counsels' advice, and incited the jury to give him the death penalty because he believed that was what the jury planned to do.  Counsel decided that he had to "get the jury to thinking that perhaps [Petitioner] was wanting the death penalty, was trying to manipulate the jury into giving him the death penalty and, therefore, the jury should not buy into it."  Counsel testified that he framed his closing argument in such a way as to convince the jury that their decision to give Petitioner the death penalty was more difficult than merely acquiescing to Petitioner's resignation that he would receive the death penalty.  Additionally, counsel was trying to convey to the jurors that while Petitioner was not a likeable person, they still had to afford him the benefit of the application of the law.  Counsel's honest portrayal of Petitioner and the facts of the case was consistent with his strategic decision to urge the jury to follow the law and determine the punishment as they saw fit.  While ultimately unsuccessful, counsel's strategy

13

was a reasonable choice in light of Petitioner's damaging testimony and the evidence against him.

Furthermore, Petitioner has not shown that but for counsel's closing argument, he would have received a life sentence.  As discussed previously, the jury had before it overwhelming evidence of Petitioner's guilt of the instant offense, as well as evidence of Petitioner's commission of various other felonies, including murder, and admitted drug use and drug dealing. On top of all of this evidence, Petitioner took the stand, argued with the prosecutors, and taunted the jury by stating that the death penalty in his case was inevitable.  The Court concludes that the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Strickland*.  28 U.S.C. § 2254(d)(1).  The Court will grant the Director's motion for summary judgment on Petitioner's second claim.

In his third claim Petitioner argues that the cumulative effect of the errors in his first two claims violates his constitutional rights.  The Fifth Circuit Court of Appeals has held that federal *habeas corpus* relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Dreden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992), *cert. denied*, 508 U.S. 960 (1993) (*quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Because the Court finds no merit in Petitioner's first two claims, this cumulative error claim must also fail.  It cannot reasonably be said that counsels' conduct so infected the trial with unfairness as to render Petitioner's

14

conviction a denial of due process.  The state court's finding that Petitioner "failed to show that there was a cumulation of errors which amounted to a constitutional deprivation of counsel" was not contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  The Court will grant the Director's motion for summary judgment on Petitioner's third claim.

In his fourth and fifth claims, Petitioner argues that his counsel were ineffective during the guilt/innocence phase of trial when they opened the door to evidence of another murder allegedly committed by Petitioner, and that introduction of this extraneous offense evidence violated due process.  In addition to the instant offense, Petitioner was originally indicted for the capital murder of Tracy Mize whose body was discovered in a septic tank on the same property where Christina Muse was found.  Prior to trial, the court granted Petitioner's motion *in limine* designed to prevent the prosecution from introducing evidence of the Mize murder during the guilt/innocence phase.  While testifying on direct examination by the prosecution, Tory Bush indicated that Petitioner urged her to mislead authorities on Muse's disappearance by placing the blame on two other people.  Bush did not name the other people, but stated that they were both dead at the time of trial.  On cross-examination, defense counsel attacked Bush's credibility, noting that she had given authorities several inconsistent statements regarding Muse's disappearance.  Bush testified that in one of her false statements to police she suggested that Mize was involved in Muse's murder.  Defense counsel then elicited the fact that while searching for Muse's body, authorities found Mize's body.  After this exchange with defense counsel, the prosecutor approached the bench, claiming that defense counsel had violated their own motion in limine by opening the door to evidence of Mize's murder.  The judge excused the jury, and listened to arguments of counsel on the issue, ultimately determining that Bush could be

questioned about her knowledge of Mize's death.

In addressing the ineffective assistance claim in his application of post-conviction relief in state court, the Texas Court of Criminal Appeals found that Petitioner had waived the issue because he failed to raise the claim on direct appeal.  Nevertheless, the state court also found that defense counsel "had a legitimate trial strategy when the facts of the murder of Tracy Mize were developed through" Bush, and that counsel did not fail to provide effective assistance of counsel by trying to impeach Bush.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

The Director argues that the state court's rejection of the ineffective assistance claim on the basis that Petitioner failed to raise the claim on direct appeal renders the claim procedurally defaulted.  However, as the Court discussed with regard to Petitioner's second claim, because Texas does not strictly or regularly bar ineffective assistance claims raised for the first time on *habeas* review, the rule cited by the state court cannot be considered an adequate state procedural ground for refusing to reach the merits of Petitioner's claim.  Accordingly, the Court will address the merits of Petitioner's ineffective assistance claim.

As in Petitioner's first two claims, to be entitled to relief based on ineffective assistance of counsel, Petitioner must meet the two-prong test set forth in *Strickland*: deficient performance and prejudice.  *See Strickland,* 466 U.S. at 687.  To prove deficient performance, "a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id*. at 688.  This is a highly deferential standard supported by a strong presumption that the decisions of counsel fall within a wide range of professional assistance.  A

16

"conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004), *cert. denied*, 127 S.Ct. 383 (2006).

At the hearing on Petitioner's Motion for New Trial, defense counsel stated that after Bush's trial testimony on direct, the defense team made the conscious decision to question Bush about Mize in an effort to impeach her.  The defense team, consulting with Petitioner, acknowledged prior to Bush's testimony that it might become necessary to impeach Bush by delving into Mize's murder.  Specifically, with regard to Mize, defense counsel explained that more than one person had to be involved in Mize's murder, and that the cross examination was intended to show that Bush, in addition to Petitioner, must have been involved.  Defense counsel stated that his questioning of Bush was not accidental, but was a necessary and expected trial tactic.

Clearly, defense counsels' decision to open the door to the admission of evidence of Mize's murder was a conscious decision in response to anticipated testimony.  Defense counsel explained his trial strategy to impeach Bush with details of Mize's murder, thereby casting doubt on the credibility of her testimony concerning Petitioner's involvement in Muse's murder.  Defense counsels' actions were reasonable and constituted sound trial strategy.  This Court finds that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law as determined by *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).

During the direct appeal to the Texas Court of Criminal Appeals, the due process argument Petitioner presents here took the form of a claim of improperly admitted evidence

under the Texas Rules of Evidence.  The Texas Court of Criminal Appeals found that the evidence was properly introduced to impeach Bush, holding that the danger of unfair prejudice in the introduction of evidence of Mize's murder did not substantially outweigh the evidence's probative value.  In his state application for post-conviction relief Petitioner added the due process claim.  The state court held that there was "no constitutional deprivation in the proper admission of evidence for impeachment purposes."  As a general rule, federal courts may not review the mere admissibility of evidence under state law.  *See Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999) (citing *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991), *cert. denied*, 502 U.S. 1113 (1992)).  If evidence of an extraneous offense is wrongly admitted, however, *habeas corpus* relief is proper if the error is of such magnitude that it resulted in "fundamental unfairness."  *See Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir.), *cert. denied*, 534 U.S. 1047 (2001) (citing *Blankenship v. Estelle*, 545 F.2d 510, 516 -17 (5th Cir. 1977), *cert. denied*, 444 U.S. 856 (1979)).  Thus, only when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will *habeas* relief be warranted.  *See Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th  Cir. 1986).

Petitioner has not shown any "fundamental unfairness" resulting from Bush's testimony about Mize's murder.  The state court analyzed the introduction of Bush's testimony about the circumstances surrounding Mize's murder and the discovery of his body.  The evidence at issue was introduced to show that Bush had lied to authorities because she was afraid of Petitioner. The trial court allowed the evidence to be admitted for the limited purpose of evaluating Bush's credibility.  Bush was perhaps the most important witness in the prosecution's case against Petitioner, and as such, her credibility was vital to the State's case.  Permitting the prosecution to

18

illicit testimony on redirect examination to demonstrate why Bush had given a false statement to authorities was the only means of rehabilitating Bush.  Allowing this evidence was not a crucial, critical, highly significant factor in Petitioner's conviction or sentence as to constitute a denial of a fundamentally fair trial.  This Court finds that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Director's motion for summary judgment will be granted on Petitioner's fourth and fifth claims.

In his sixth and seventh claims, Petitioner argues that his trial counsel were ineffective for allowing extraneous offense evidence of the kidnapping and assault of witness Wesley Crocker, and that introduction of this evidence violated Petitioner's due process rights.  On direct appeal Petitioner complained that the trial court erred in allowing the prosecution to introduce this evidence.  The Texas Court of Criminal Appeals found that the trial court did not err in overruling Petitioner's objection under Texas Rule of Evidence 403.  The state court found that "[t]he value of the evidence was great since it assisted the State in proving identity" and was not unfairly prejudicial to Petitioner.  Additionally, in his state application for post-conviction relief, the Texas Court of Criminal Appeals found that "[t]here was no failure of trial counsel to prevent the admission of evidence that was clearly admissible."  The court further concluded that because the evidence was admissible, there was no due process violation.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

As in Petitioner's previous claims, to be entitled to relief based on ineffective assistance of counsel, Petitioner must meet the two-prong test set forth in *Strickland*: deficient performance and prejudice.  *See Strickland,* 466 U.S. at 687.  The prosecution called Crocker to testify during

the guilt-innocence phase of trial.  Pursuant to the defense's motion *in limine* regarding

introduction of extraneous offense evidence, the prosecution informed the trial court that it

intended to introduce evidence that Petitioner had kidnapped Crocker and used a stun gun on

him.  Defense counsel objected on the basis that such evidence was highly prejudicial.  The

prosecution argued that the evidence would show similarities between the incident with Crocker

and the circumstances surrounding the victim's murder in this case.  The trial court allowed the

evidence, noting that Petitioner had made an issue of identity when he suggested that other

people were responsible for the victim's murder.

Crocker testified that Petitioner thought Crocker owed him money for drugs, so Petitioner

had two men pick Crocker up at a bar one night and take Crocker to Petitioner's cousin's

mechanic shop.  Petitioner then beat Crocker with a tire iron and pulled a gun on Crocker when

Crocker tried to escape.  Petitioner later took Crocker back to Petitioner's house where he used a

stun gun on Crocker and beat him with a wire brush.  Petitioner released Crocker when Crocker

agreed to work off his drug debt by working at Petitioner's house.

Petitioner cannot demonstrate that his counsel were ineffective or that introduction of the

evidence violated Petitioner's due process rights.  Counsel properly objected to the introduction

of the foregoing evidence, arguing that allowing it would prejudice Petitioner's case.  The state

court on direct appeal accurately defined the evidence as prejudicial, but recognized that it was

not unfairly prejudicial.  The defense clearly raised the issue of identity of the murderer.  As

such, admission of evidence of the kidnapping and assault of Crocker, which was similar to

testimony of Petitioner's treatment of the victim in this case, was probative. By the same token,

testimony by Amber Scroggins that she had seen a stun gun at Petitioner's residence was more

probative than prejudicial.  Accordingly, the state court's finding that defense counsel was not ineffective, and that there was no violation of due process, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).  The Director's motion for summary judgment will be granted on Petitioner's sixth and seventh claims.

In his eighth claim Petitioner argues that his counsel were ineffective in failing to object to a comment the trial court made regarding Petitioner's credibility.  In his ninth claim Petitioner further complains that the trial court's comment violated Petitioner's right to a fair trial.  The state court addressed these claims in Petitioner's application for state post-conviction relief and found that counsel was not ineffective for failing to object and that there was no error in the response of the trial judge.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

Against defense counsels' advice, Petitioner testified at the guilt-innocence phase of trial. Petitioner explained that he was not at his residence when the victim was killed because he was delivering drugs to people.  When the prosecutor asked Petitioner who he was delivering drugs to, Petitioner said, "I don't want to get nobody in trouble, but I guess I've got to tell the truth." The trial judge responded, "Yeah.  You're supposed to."  Petitioner argues that the judge's comment violated Texas Code of Criminal Procedure art. 38.05 which provides that "[i]n ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same . . . nor shall he . . . make any remark calculated to convey to the jury his opinion of the case."  Petitioner urges that competent counsel would have been familiar with this rule and the

21

effects the judge's comment would have had on the jury.

The Court's role in resolving Petitioner's claims is to determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial. *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994), *cert. denied*, 514 U.S. 1097 (1995) (addressing both due process and ineffective assistance of counsel claims).   To rise to the level of constitutional error, the judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor.   *See id*.   Contrary to Petitioner's contention, the trial court's comment cannot be characterized as a comment on the weight of the evidence.   The trial judge's comment had nothing to do with the case or the evidence, nor was the judge suggesting that Petitioner was not being truthful.   Rather, the court was reiterating the Petitioner-witness' duty to testify truthfully. This is a correct statement of the law.   In *United States v. Greer*, 806 F.2d 556, 559 (5th Cir. 1986), a defense witness, while being examined by the prosecution, asked the prosecutor if he wanted the truth.   The trial court interrupted the questioning to remind the witness that his oath required the truth and instructed the witness to testify accordingly.   The Fifth Circuit found no error, noting that the judge, "as overseer of the trial, has the duty to ensure that all witnesses understand the importance of their appearance and adhere to the oath of truthfulness."   The court's comment in the instant case served the same purpose as the trial court's comment in *Greer*.   Because the trial court's comment was not improper, counsels' failure to object cannot amount to ineffective assistance.   *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (finding counsel was not ineffective for failing to object to trial judge's comments that were not prejudicial enough to rise to the level of a constitutional violation).   The state court's finding that

22

defense counsel was not ineffective, and that there was no violation of due process, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).

In his tenth and final claim, Petitioner argues that the cumulative effect of the errors which occurred during his trial violated his constitutional rights.  In reaching this claim raised in his state application for post-conviction relief, the state court found that Petitioner's complaint was improperly briefed and apart from the briefing failure, was without merit because there were no constitutional errors in the trial.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

The Court's careful consideration and analysis of Petitioner's claims supports the state court's conclusion.  As this Court discussed in addressing Petitioner's third claim, relief can only be granted here if (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."  *See Derden*, 978 F.2d at 1456.  Although errors were committed, none rose to the level of a violation of Petitioner's constitutional rights.  Petitioner has failed to cite any authority supporting his claim of cumulative error.  As such, the Court finds that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  The Director's motion for summary judgment will be granted on Petitioner's tenth claim.

SIGNED this 14th day of September, 2007.

_T. John Ward_

T. JOHN WARD
UNITED STATES DISTRICT JUDGE